1   **WO**

2

3

4

5

6                   **IN THE UNITED STATES DISTRICT COURT**

7                       **FOR THE DISTRICT OF ARIZONA**

8

9   Christopher J. Spreitz,                )   No. CV 02-121-TUC-JMR
                                            )
10              Petitioner,                 )   DEATH PENALTY CASE
                                            )
11   v.                                     )
                                            )   **MEMORANDUM OF DECISION**
12                                          )   **AND ORDER**
     Charles L. Ryan, et al.,[1]           )
13                                          )
                Respondents.                )
14   _____       )
                                            )

15

16          Christopher J. Spreitz (Petitioner) has filed an Amended Petition for Writ of Habeas

17   Corpus pursuant to 28 U.S.C. § 2254, alleging that he is imprisoned and sentenced to death

18   in violation of the United States Constitution.  (Dkt. 38.)[2]  For the reasons set forth herein,

19   the Court determines that Petitioner is not entitled to habeas relief.

20                   **FACTUAL AND PROCEDURAL BACKGROUND**

21          In the early morning hours of May 19, 1989, Petitioner was stopped by police because

22   his car was smoking and leaking oil.[3]  His arms, legs, and shirt were smeared with blood and

23   _____

24          [1]      Charles L. Ryan, Interim Director of the Arizona Department of Corrections,

25   is substituted for his predecessor pursuant to Fed. R. Civ. P. 25(d)(1).

26          [2]      "Dkt." refers to the documents in this Court's file.

27          [3]      This factual summary is based on the Court's review of the record and the

28   Arizona Supreme Court's opinion upholding Petitioner's conviction and sentence.  *State v.*
     *Spreitz*, 190 Ariz. 129, 945 P.2d 1260 (1997).

fecal matter, and he claimed he had been in a fight with another man.  The officers asked Petitioner to accompany them to the scene of the fight.  Petitioner agreed, but upon arrival there was no sign a fight had taken place.  Another officer was brought in to take pictures of Petitioner, who consented to being photographed.  Although the officers could smell beer on Petitioner's breath, they did not believe he was impaired and released him with a repair order for his car.

Several days later, the naked and decomposing body of Ruby Reid was found in the desert on the outskirts of Tucson.  At the scene, police officers observed tire tracks, oil stains, feces-stained pants, and a torn brassiere.  Two blood-stained rocks lay next to the body.

Two days after the body's discovery, during a chance encounter at the police station, the investigating detective discussed the Reid case with the officer who had taken photographs of Petitioner during the traffic stop.  Believing Petitioner may have been involved with Reid's death, the police executed an arrest warrant for outstanding traffic citations.  While in custody, Petitioner confessed to killing Reid.

Petitioner was indicted in June 1989 for first degree murder, sexual assault, and kidnapping.  Due to extensive pretrial litigation concerning admissibility of DNA evidence, trial did not commence until August 1994.  During this lengthy period, Petitioner was represented by three attorneys: William G. Lane, from indictment through November 1991; M. Josephine Sotelo, a DNA specialist, from May 1991 to June 1994, when the trial court barred use of DNA evidence as a discovery sanction; and Marshall Tandy, from November 1991 through sentencing.  A jury convicted Petitioner on all counts in August 1994.[4]  During the sentencing hearing, Petitioner apologized for killing Reid.  (RT 12/21/94 at 12.)  The trial judge sentenced him to death on the murder conviction.

On appeal, the Arizona Supreme Court affirmed.  *State v. Spreitz*, 190 Ariz. 129, 945

---

[4]    The jury unanimously convicted Petitioner under each of the alternative theories of premeditated and felony murder.  (RT 8/18/94 at 758.)

1   P.2d 1260 (1997).  On March 28, 2000, Petitioner filed a petition for post-conviction relief

2   (PCR), which the PCR court denied without a hearing.  The Arizona Supreme Court reversed

3   the PCR court's ruling that Petitioner's ineffective assistance of counsel (IAC) claims were

4   precluded but affirmed the court's alternative ruling that the claims lacked merit.  *State v.*

5   *Spreitz*, 202 Ariz. 1, 39 P.3d 525 (2002).

6          Petitioner then initiated the instant habeas proceedings and filed an amended petition

7   raising numerous claims for relief.[5]  (Dkt. 38.)  He subsequently moved for an evidentiary

8   hearing with respect to his IAC claims.  The Court denied the motion without prejudice

9   because Petitioner had not identified which claims required a hearing and had failed to

10  explain what facts needed further development or how such facts would entitle him to relief.

11  (Dkt. 56 at 4.)  Petitioner filed a renewed motion for evidentiary development.  (Dkt. 74.)

12  The Court denied this motion as well, concluding that Petitioner had failed to diligently seek

13  development of his IAC claims in state court.  (Dkt. 89 at 37.)  The Court also dismissed

14  several of the claims on the merits.  (*Id*. at 38.)  This order addresses Petitioner's remaining

15  habeas claims.

16  <u>**PRINCIPLES OF EXHAUSTION AND PROCEDURAL DEFAULT**</u>

17         A writ of habeas corpus cannot be granted unless it appears that the petitioner has

18  exhausted all available state court remedies.  28 U.S.C. § 2254(b)(1); *see also Coleman v.*

19  *Thompson*, 501 U.S. 722, 731 (1991); *Rose v. Lundy*, 455 U.S. 509 (1982).  To exhaust state

20  remedies, the petitioner must "fairly present" his claims to the state's highest court in a

21  procedurally appropriate manner.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

22         A claim is "fairly presented" if the petitioner has described the operative facts and the

23  federal legal theory on which his claim is based so that the state courts have a fair

24  opportunity to apply controlling legal principles to the facts bearing upon his constitutional

25  ─────────────

26         [5]    The amended petition does not sequentially label all of Petitioner's claims and

27  sub-claims.  Accordingly, the Court has adopted its own identification system, endeavoring
    to utilize as near as possible the claim numbers set forth in the amended petition.

28

claim. *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78 (1971).  Unless the petitioner clearly alerts the state court that he is alleging a specific federal constitutional violation, he has not fairly presented the claim.  *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004).  A petitioner must make the federal basis of a claim explicit either by citing specific provisions of federal law or federal case law, even if the federal basis of a claim is "self-evident," *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999), or by citing state cases that explicitly analyze the same federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc).

In Arizona, there are two primary procedurally appropriate avenues for petitioners to exhaust federal constitutional claims:  direct appeal and post-conviction relief proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition.  Ariz. R. Crim. P. 32.2(a)(3).  The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions (subsections (d) through (h) of Rule 32.1) and the petitioner can justify why the claim was omitted from a prior petition or not presented in a timely manner.  *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds.  *Coleman*, 501 U.S. at 729-30.  Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (stating that the district court must consider whether the claim could be pursued by any presently available state remedy).  If no remedies are currently available pursuant to Rule 32, the claim is "technically" exhausted but procedurally defaulted.  *Coleman*, 501 U.S. at 732, 735 n.1; *see*

- 4 -

1    *also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996).

2          Because the doctrine of procedural default is based on comity, not jurisdiction, federal

3    courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*,

4    468 U.S. 1, 9 (1984).   As a general matter, the Court will not review the merits of a

5    procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure

6    to properly exhaust the claim in state court and prejudice from the alleged constitutional

7    violation, or shows that a fundamental miscarriage of justice would result if the claim were

8    not heard on the merits in federal court. *Coleman*, 501 U.S. at 750.

9          Ordinarily, "cause" to excuse a default exists if a petitioner can demonstrate that

10   "some objective factor external to the defense impeded counsel's efforts to comply with the

11   State's procedural rule." *Id*. at 753.   Objective factors which constitute cause include

12   interference by officials which makes compliance with the state's procedural rule

13   impracticable, a showing that the factual or legal basis for a claim was not reasonably

14   available to counsel, and constitutionally ineffective assistance of counsel. *Murray v.*

15   *Carrier*, 477 U.S. 478, 488 (1986).   "Prejudice" is actual harm resulting from the alleged

16   constitutional error or violation. *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998).   To

17   establish prejudice resulting from a procedural default, a habeas petitioner bears the burden

18   of showing not merely that the errors at his trial constituted a possibility of prejudice, but that

19   they worked to his actual and substantial disadvantage, infecting his entire trial with errors

20   of constitutional dimension. *United States v. Frady*, 456 U.S. 152, 170 (1982).

21                      **STANDARD FOR HABEAS RELIEF**

22         Under the AEDPA, a petitioner is not entitled to habeas relief on any claim

23   "adjudicated on the merits" by the state court unless that adjudication:

24         (1) resulted in a decision that was contrary to, or involved an unreasonable
           application of, clearly established Federal law, as determined by the Supreme
25         Court of the United States; or

26         (2) resulted in a decision that was based on an unreasonable determination of
           the facts in light of the evidence presented in the State court proceeding.
27

28                                    - 5 -

1  28 U.S.C. § 2254(d).  The phrase "adjudicated on the merits" refers to a decision resolving

2  a party's claim which is based on the substance of the claim rather than on a procedural or

3  other non-substantive ground.  *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).  The

4  relevant state court decision is the last reasoned state decision regarding a claim.  *Barker v.*

5  *Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-

6  04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

7  "The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule

8  of law that was clearly established at the time his state-court conviction became final."

9  *Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Therefore, to assess a claim under subsection

10  (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs

11  the sufficiency of the claims on habeas review.  "Clearly established" federal law consists

12  of the holdings of the Supreme Court at the time the petitioner's state court conviction

13  became final.  *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70 (2006): *Clark*

14  *v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).  Habeas relief cannot be granted if the

15  Supreme Court has not "broken sufficient legal ground" on a constitutional principle

16  advanced by a petitioner, even if lower federal courts have decided the issue.  *Williams*, 529

17  U.S. at 381.  Nevertheless, while only Supreme Court authority is binding, circuit court

18  precedent may be "persuasive" in determining what law is clearly established and whether

19  a state court applied that law unreasonably.  *Clark*, 331 F.3d at 1069.

20  The Supreme Court has provided guidance in applying each prong of § 2254 (d)(1).

21  The  Court has explained that a state court decision is "contrary to" the Supreme Court's

22  clearly established precedents if the decision applies a rule that contradicts the governing law

23  set forth in those precedents, thereby reaching a conclusion opposite to that reached by the

24  Supreme Court on a matter of law, or if it confronts a set of facts that is materially

25  indistinguishable from a decision of the Supreme Court but reaches a different result.

26  *Williams*, 529 U.S. at 405-06; *see Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).  In

27  characterizing the claims subject to analysis under the "contrary to" prong, the Court has

28

- 6 -

1  observed that "a run-of-the-mill state-court decision applying the correct legal rule to the

2  facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to'

3  clause." *Williams*, 529 U.S. at 406; *Lambert*, 393 F.3d at 974.

4          Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court

5  may grant relief where a state court "identifies the correct governing legal rule from [the

6  Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or

7  "unreasonably extends a legal principle from [Supreme Court] precedent to a new context

8  where it should not apply or unreasonably refuses to extend that principle to a new context

9  where it should apply." *Williams*, 529 U.S. at 407.  In order for a federal court to find a state

10  court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the

11  petitioner must show that the state court's decision was not merely incorrect or erroneous,

12  but "objectively unreasonable."  *Id.* at 409; *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)

13  (per curiam).

14          Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state

15  court decision was based upon an unreasonable determination of the facts.  *Miller-El v.*

16  *Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*).  A state court decision "based on a factual

17  determination will not be overturned on factual grounds unless objectively unreasonable in

18  light of the evidence presented in the state-court proceeding."  *Miller-El v. Cockrell*, 537

19  U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddux*, 366 F.3d 992, 999 (9th Cir. 2004).

20  In considering a challenge under § 2254(d)(2), state court factual determinations are

21  presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by

22  clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240.

23                                          **DISCUSSION**

24  **I.     CONVICTION-RELATED CLAIMS**

25          At trial, the crucial evidence against Petitioner was his own taped confession, which

26  was played to the jury.  (RT 8/11/94 at 466.)  In the confession, Petitioner admitted picking

27  up Ruby Reid at a convenience store and driving her to a remote area in the desert where they

28

1   began to "make out." (Dkt. 63, Ex. J at 9.)  At some point, Reid told Petitioner she wanted

2   something to drink and became upset that he did not have anything.  She was angry, began

3   yelling, and told him she did not want to have sex.  (*Id.* at 12, 15.)  She got out of the car;

4   Petitioner followed and caught up with her.  At some point, she fell to the ground.  (*Id.* at 10,

5   12-13.)  Petitioner then jumped on top of her, ripped off her remaining clothing, including

6   a bloody and fecal-stained tampon, and had intercourse with her. (*Id.* at 10-11, 16.)  He was

7   angry and began to hit her repeatedly.  (*Id.* at 10, 12-13.)  Reid continued to yell.  Petitioner

8   then hit her in the head several times with a rock to quiet her.  After she became silent he left

9   the scene not knowing if she was dead or alive. (*Id.* at 16-17.)  Several days later he rode his

10  bicycle back to the area to see if she was still there.  (*Id*. at 18.)  He did not know that

11  authorities had discovered and removed her body the day before.  (*Id*.)

12       Alana Owens, one of Petitioner's roommates, testified that Petitioner and her

13  boyfriend, who also lived with Petitioner, went out drinking early on the evening of May 18.

14  When they returned at about 12:15 a.m., her boyfriend was very drunk.  (RT 8/11/94 at 329-

15  30.)  However, Petitioner seemed fine and left shortly thereafter, stating that he wanted to

16  "pick up a date." (*Id*. at 331.)  Petitioner returned at about 3:00 a.m. but Owens did not see

17  him right away as he went straight to the bathroom upstairs.  (*Id*. at 332.)  He came down

18  about fifteen minutes later wearing only a towel.  Petitioner asked Owens what she would

19  do if someone in her gang killed someone.  He then told her he had been in a fight with a

20  black man, that Petitioner got the best of him, and that he did not know if the guy was still

21  alive.  (*Id.* at 333-35.)  Owens later went to the bathroom and noticed Petitioner had placed

22  wet clothes and a pair of tennis shoes in the tub.  The shoes had dark stains on them.  (*Id*. at

23  338.)

24       Tucson Police Officer Ramon Batista testified that he initiated a stop of Petitioner's

25  car at approximately 1:45 a.m. the morning of the murder.  (RT 8/10/94 at 223-24.)  When

26  Petitioner got out of his car, Batista noticed that his shirt was torn and he was covered in

27  blood and feces.  (*Id.* at 227.)  Sergeant Victor Chacon arrived shortly thereafter and

28

observed that Petitioner was "covered in blood" but did not appear to have any injuries. (*Id.* at 247-48.) Petitioner told Chacon about a fight with a black man. When asked why he was "covered in blood" but had no injuries, Petitioner explained that his injuries did not bleed but that the other man was badly hurt and had bled. (*Id.* at 248.) Chacon later noticed that Petitioner also had feces on his body.

Detectives Karen Wright and Joseph Godoy described the scene where the victim's body was found several days later in a desert area near some brush. Godoy testified that photographs of the scene showed "lines" in the soil evidencing a scuffle as well as "drag marks" leading from the body, indicating that it had been moved. (RT 8/11/94 at 435-42.) Wright described photographs showing tire marks and oil stains. (RT 8/12/94 at 515.) Pants, tennis shoes, socks, a torn brassiere, and a used tampon were strewn about the site. Blood was found on soil and rocks near the body. (*Id.* at 511-15.)

Because the victim's body was badly decomposed, her blood was not positively identified. However, Steven Clemens, a criminalist who tested the blood stains in Petitioner's car and on the clothing and rocks at the crime scene, testified that stains in the trunk of the car and at the crime scene were not consistent with Petitioner's blood. (*Id.* at 555-68.) Clemens further opined that the blood found in Petitioner's trunk and rear bumper, on the soil around the crime scene, and on Reid's brassiere and tampon may have come from the same person. (*Id.* at 572.) Her brassiere had been "torn off." (*Id.* at 569.) Clemens noted that feces was found in Reid's discarded tampon. (*Id.* at 570.)

Dr. Thomas Henry, a forensic pathologist who autopsied Reid, testified that she was killed by a severe fracture of her skull. (RT 8/16/94 at 634-35.) She also sustained multiple injuries, including several bruises and lacerations to her head, arms, legs, and torso. She had several fractured ribs and a broken jaw. She also had internal injuries, most likely caused by blunt trauma. (*Id.* at 624-27.)

1

2

**Claim 1:      Petitioner's Right to a Speedy Trial under the Sixth and Fourteenth Amendments Was Violated**

3

Petitioner alleges that the delay between his arraignment in June 1989, and the

4

commencement of his trial in August 1994, violated his federal constitutional right to a

5

speedy trial. He contends this delay was attributable primarily to the State's desire to present

6

DNA evidence "and cannot be counted against Petitioner." (Dkt. 38 at 30.)  He argues that

7

the delay prejudiced him in several ways, including oppressive pretrial incarceration,

8

prolonged anxiety caused by the knowledge he faced a potential death sentence, and

impairment of his defense due to compromised or unavailable witnesses. (*Id.* at 31-32.)

9

*Background*

10

Petitioner was arraigned on June 12, 1989.  (ROA at 26.)[6]    After a series of

11

continuances, at a pretrial conference held on August 30, 1989, the parties agreed to a trial

12

date of February 14, 1990.  Petitioner personally agreed to this postponement.  (RT 8/30/89

13

at  4.)  At a hearing on January 25, 1990, both parties asked the trial court for a continuance

14

until April 3, 1990.  The primary reason for the delay was that it would take until the end of

15

March before DNA test results from the crime scene were analyzed.  The Court agreed to a

16

continuance provided counsel filed a written motion and a waiver from Petitioner.  (RT

17

1/25/90 at 2-7.)  Both documents were filed shortly thereafter.  (ROA at 57, 59.)  Additional

18

continuances were granted with Petitioner's express consent up through a trial date of April

19

23, 1991.  (*Id.* at 64-69, 93-95, 226-31.)

20

On January 2, 1991, the State moved for admission of the DNA test results.[7]  (ROA

21

22

23

        [6]      "ROA" refers to the thirteen-volume record on appeal from trial and sentencing

24

prepared for Petitioner's direct appeal (Case No. CR-94-0454-AP).  "RT" refers to the reporter's transcript.  The original reporter's transcripts and certified copies of the state court

25

records were provided to this Court by the Arizona Supreme Court.  (Dkt. 64.)

26

        [7]      The record does not contain a precise description of the DNA evidence.

27

However, in its motion the State characterized the DNA tests as establishing that Ruby Reid's blood was in the interior and trunk of Petitioner's car.  (ROA at 210.)

28

1   at 208.)  On April 17, 1991, Petitioner's counsel filed a motion to continue the April 23 trial

2   date.  (*Id.* at 278.)  At oral argument, both Petitioner's counsel and the prosecution argued

3   that matters involving the admissibility of DNA evidence were still in flux and that additional

4   time was needed before trial could proceed.  (RT 4/23/91 at 2-8.)  The Court vacated the trial

5   date.  (ROA at 281.)

6       On May 2, 1991, the trial court granted Petitioner's request for additional DNA

7   experts and for the appointment of Josephine Sotelo to be lead attorney in addressing DNA

8   issues.  (ROA at 283.)  On May 17, Sotelo moved to compel production of documents and

9   data from the FBI lab involved in processing the DNA evidence.  (*Id.* at 294-309.)  In

10  November and December 1991, the court held an evidentiary hearing to determine the scope

11  of matters to be addressed at the impending *Frye* hearing.  (*Id.* at 810, 1047, 1072, 1074,

12  1076, 1084, 1086, 1317, 1340-42.)  Thereafter, Petitioner unsuccessfully challenged the trial

13  court's ruling as to the scope of the *Frye* hearing in a special action to the Arizona Court of

14  Appeals, followed by an unsuccessful petition for review to the Arizona Supreme Court.  (*Id.*

15  at 1587, 1602.)  These challenges delayed proceedings through the end of 1992.

16      The trial court scheduled further matters concerning the DNA evidence into 1993.  At

17  a status conference held on February 17, 1993, Petitioner requested a hearing to determine

18  what his counsel, Marshall Tandy, had been doing to advance his case.  (ROA at 1628.)  At

19  a hearing on March 3, 1993, Tandy told the court that because the DNA hearings were

20  ongoing and Ms. Sotelo had been especially retained to litigate those matters, "there's

21  nothing ongoing, right now, and Mr. Spreitz has been sitting in jail for a long time."  (RT

22  3/3/93 at 3.)  At a hearing two weeks later, Petitioner withdrew his reservations about Tandy.

23  (RT 3/19/93 at  3, 7.)

24      The *Frye* hearing began in April 1993 and continued through June.  (ROA at 1633-43,

25  1664-69, 1681-87).  On December 3, 1993, the trial court issued a minute entry granting the

26  State's request for admission of the DNA evidence.  (*Id.* at 1938-46.)  The court followed up

27  with formal findings of fact and conclusions of law on January 12, 1994.  (*Id.* at 1947-67.)

28

- 11 -

1    On February 18, 1994, the court set a trial date of June 28, 1994.  (ROA at 1933.)

2    However, additional DNA and other pre-trial matters continued to be litigated into June.  (*Id.*

3    at 1983-86.)  On June 3, the trial court granted Petitioner's motion to exclude the DNA

4    evidence based on the State's failure to comply with orders to disclose to the defense the

5    names of all lab technicians in the case.  (*Id*. at 2005.)

6    At a hearing on June 15, 1994, Petitioner advised the court that he would be moving

7    to dismiss the case based on a violation of his right to a speedy trial.  (RT 6/15/94 at 2-3.)

8    On June 17, 1994, Petitioner moved to continue the June 28 trial date; the court granted the

9    continuance and reset trial for August 9, 1994.  (ROA at 2141-42.)  The court denied

10   Petitioner's speedy trial motion on July 25, 1994.  (*Id*. at 2158-59.)  Trial commenced on

11   August 9, 1994.

12   On direct appeal, the Arizona Supreme Court rejected Petitioner's speedy trial claim.

13   The court first concluded that the delay did not warrant reversal under Arizona law, noting

14   that after Petitioner's express waiver of time expired on April 23, 1991, he "could have

15   asserted his rights and filed a motion to dismiss any time after thirty-three days past April 23,

16   1991; he elected not to do so."  *Spreitz*, 190 Ariz. at 139, 945 P.2d at 1270.  The court further

17   noted that, although the period between arraignment and trial was "unprecedented,"

18   Petitioner and his counsel knew or should have known of his right to demand a trial within

19   the times limits of Rule 8 of the Arizona Rules of Criminal Procedure because "the trial

20   judge explained this right to defendant each time the court continued the trial date."  *Id.*

21   Next, the court addressed the constitutional implications of the delay:

22   Neither the United States nor the Arizona Constitution requires that a
     trial be held within a specified time period.  In *Barker v. Wingo*, the Supreme
23   Court established a test by which courts decide whether trial delay warrants
     reversal.  The four-factor *Barker* analysis examines "(1) the length of the
24   delay; (2) the reason for the delay; (3) whether the defendant has demanded a
     speedy trial; and (4) the prejudice to the defendant."  In weighing these factors,
25   the length of the delay is the least important, while the prejudice to defendant
     is the most significant.  We apply each of the *Barker* factors to the facts
26   presented here.

27   A pretrial period after arraignment of over five years is presumptively

28
                                        - 12 -

prejudicial. This factor, however, must be considered in concert with the remaining three *Barker* factors. Not surprisingly, defendant attributes the reason for the delay primarily to the state's desire to present DNA evidence. In fact, the evidentiary hearings were required when defendant moved to exclude this evidence. We agree with the state that it would be unjust to allow defendant to force exclusion of potentially probative evidence where its admission provides a court with an issue of first impression and requires a lengthy evidentiary hearing. Where, as here, a defendant fights to exclude DNA evidence, the delay resulting from hearings necessary to determine admissibility is necessarily attributable to the defense. Obviously, we conclude that a defendant may contest the admissibility of scientific evidence but not that he may do so and then later contend violation of speedy trial rights due to delays occasioned by the contest. In so stating, we do not seek to penalize the defendant but merely to accommodate his wishes without jeopardizing the state's interest in bringing the matter to trial.

Here, defendant waived his speedy trial rights in advance of the hearings and, for reasons the record does not reveal, never objected to the court that his rights had been compromised by the long delay. Thus, we find that the reason for the delay weighs against defendant's position. Defendant did not move to dismiss for violation of speedy trial rights until after the DNA evidentiary hearing process had run its three-year course. His assertion of rights was thus untimely and bears little weight in our *Barker* analysis. Furthermore, defendant did not complain of any violation of speedy trial rights until twelve days before trial, and the next day he moved to continue the trial because of defense counsel's scheduling conflict.

Finally, defendant claims no prejudice from the trial delay other than that arising out of his long period of custody. While five years in custody may have increased defendant's anxiety quotient, we find, on the entire record, that the delay did not prejudice his ability to defend against the state's claims. After weighing each of the *Barker* factors, we conclude that defendant's constitutional right to an expeditious trial has not been unduly disturbed.

*Id.* at 139-40, 945 P.2d at 1270-71 (citations omitted).

*Analysis*

As a threshold matter, the Court rejects Respondents' assertion that the Arizona Supreme Court's finding of waiver under Rule 8 of the Arizona Rules of Criminal Procedure constitutes an alternative ruling to its merits analysis of Petitioner's federal constitutional claim and that Claim 1 is therefore procedurally defaulted. (Dkt. 62 at 20.) It is evident from both Petitioner's appellate brief and the state supreme court's decision that Petitioner presented this claim on two separate legal fronts: as a violation of Rule 8 and as a violation of his state and federal constitutional rights. Although the state court determined that Petitioner had "waived his right to object [under Rule 8] by not objecting when the violation

1   was occurring," this waiver finding was simply one factor in the court's analysis of

2   Petitioner's federal constitutional claim.  *Spreitz*, 190 Ariz. at 139-40, 945 P.2d 1270-71.

3   Therefore, this Court addresses the merits of the federal constitutional aspect of Petitioner's

4   speedy trial claim.

5          As the state supreme court noted, the United States Supreme Court has directed courts

6   to consider four factors in determining whether there has been a constitutional speedy trial

7   violation: (1) the length of the delay and whether it was "uncommonly long"; (2) the reason

8   for the delay, including whether the government or the defendant was responsible for it; (3)

9   the defendant's assertion of the right; and (4) whether the defendant suffered prejudice as a

10  result of the delay.  *See Doggett v. United States*, 505 U.S. 647, 651 (1992) (citing *Barker*

11  *v. Wingo*, 407 U.S. 514, 530 (1972)); *see also Reed v. Farley*, 512 U.S. 339, 353 (1994) ("A

12  showing of prejudice is required to establish a violation of the Sixth Amendment Speedy

13  Trial Clause.").

14         Prejudice may consist of oppressive pretrial incarceration, the anxiety and concern of

15  the accused, and the possibility that the defense will be impaired.  *Doggett*, 505 U.S. at 654.

16  Of these concerns, "the most serious is the last, because the inability of a defendant

17  adequately to prepare his case skews the fairness of the entire system."  *Barker*, 407 U.S. at

18  532.  The burden of showing prejudice lies with the individual claiming the violation, and

19  the mere possibility of prejudice is not sufficient to support the position that speedy trial

20  rights are violated. *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986); *see United States*

21  *v. Baker*, 63 F.3d 1478, 1497 (9th Cir. 1995) (no need to examine other factors where

22  defendant fails to show prejudice from delay).

23         With respect to the claim's merits, the Court concludes that Petitioner is not entitled

24  to habeas relief.  While a five-year delay between arraignment and trial is presumptively

25  prejudicial, *see Doggett*, 505 U.S. at 652 n.1, when weighed against the other *Barker* factors,

26  the delay does not warrant relief under the circumstances of this case.

27         Much of the delay in this case is attributable to resolution of legitimate pretrial

28

- 14 -

1  motions, a fact that weighs against the finding of a speedy trial violation. As the Court noted

2  in *Doggett*, "speedy trial standards recognize that pretrial delay is often both inevitable and

3  wholly justifiable. The government may need time to collect witnesses against the accused,

4  [or] oppose pretrial motions. . . . We attach great weight to such considerations when

5  balancing them against the costs of going forward with a trial whose probative accuracy the

6  passage of time has begun by degrees to throw into question." 505 U.S. at 656; *see United*

7  *States v. O'Dell*, 247 F.3d 655, 668 (6th Cir. 2001) (resolution of pretrial motions justifies

8  delay); *United States v. Schlei*, 122 F.3d 944, 987 (11th Cir. 1997) (delay due to resolution

9  of pretrial motions did not trigger violation of Sixth Amendment right to a speedy trial);

10  *United States v. Jones*, 91 F.3d 5, 8 (2d Cir. 1996) ("legitimate pretrial proceedings are

11  'neutral reasons not attributable to the government'").

12      Here, the delay arose from litigation concerning the admissibility of DNA evidence.

13  Petitioner assigns responsibility to the State and its "desire to present the DNA evidence."

14  (Dkt. 38 at 30.) However, the Arizona Supreme Court determined that the protracted nature

15  of the litigation was not occasioned by the State's desire to introduce DNA evidence but,

16  rather, by Petitioner's objection to its admission. The court noted that the evidentiary

17  hearings and litigation related to the DNA issues stemmed from Petitioner's desire to exclude

18  the evidence at trial and, therefore, any delay was "necessarily attributable to the defense."

19  *Spreitz*, 190 Ariz. at 140, 945 P.2d at 1271.

20      Indeed, Petitioner sought and obtained from the trial court appointment of counsel

21  who specialized in DNA evidence.[8] Counsel thereafter zealously challenged the scope and

22  admissibility of such evidence, including, at one point, pursuing a special action to the

23  Arizona Court of Appeals and a petition for review to the Arizona Supreme Court. Thus, this

24  Court agrees that the primary cause of the delay was attributable to Petitioner rather than the

25

26      [8]    The reason for appointment of special counsel and the prolonged litigation
27  appears to be due to the fact that this case was a "test case" in Pima County for the
admissibility of RFLP DNA evidence. *Spreitz*, 190 Ariz. at 139, 945 P.2d at 1270.

28

- 15 -

1  State.   As the Arizona Supreme Court noted, while Petitioner was within his rights to

2  challenge the admissibility of the DNA evidence, he could not do so and then contend that

3  his speedy trial rights were violated by the consequent delay.

4         The third *Barker* factor also weighs against Petitioner's claim.   Petitioner did not

5  assert his speedy trial rights in a timely fashion.  He expressly waived these rights for the first

6  two years following his arraignment.   After that, although not expressly waiving his rights,

7  Petitioner failed to allege any violation of his right to a speedy trial until June 1994, a full

8  five years after his arraignment.  Even then, just days later, he moved for another continuance

9  and trial was again postponed for several months.

10        With regard to prejudice, Petitioner proffers several arguments.  First, a paraplegic

11  who died before trial and for whom Petitioner provided care could have provided helpful

12  testimony at the sentencing hearing about his personal experiences with Petitioner.  Second,

13  a former girlfriend could have provided testimony at the sentencing hearing concerning his

14  intoxication on the night of the murder.   Third, the delay hindered Petitioner's ability to

15  locate and talk to other potential witnesses, including family members, and caused his

16  "mental abilities" to deteriorate.  (Dkt. 38 at 33.)  Finally, Petitioner asserts that "excessive

17  delay presumptively compromises the reliability of a trial in ways that neither party can

18  prove or, for that matter, identify" and therefore specific impairment need not be shown.

19  (Dkt. 38 at 34 (quoting *Doggett*, 505 U.S. at 656).)

20        While it is true that specific impairment is difficult to establish, the Court has

21  cautioned that presumed prejudice from excessive delay "cannot alone carry a Sixth

22  Amendment claim without regard to the other *Barker* criteria."  *Doggett*, 505 U.S. at 656.

23  Here, other than the delay itself, none of the other *Barker* factors supports Petitioner's claim

24  of unconstitutional delay.  In addition, Petitioner alerted the judge to his work as a nurse and

25  caregiver to a paraplegic prior to sentencing (Dkt. 63, Ex. T at 1), and Petitioner has not

26  supported his claim that his ex-girlfriend could have provided relevant testimony concerning

27

28
                                         - 16 -

his level of intoxication.[9]  Thus, Petitioner's claim of impairment to his sentencing defense fails.  He also has failed to substantiate his claim of diminished "mental abilities" resulting from the delay or shown that there were other witnesses or evidence that could have been presented but for the five-year delay.

Weighing all the *Barker* factors, the Court concludes that the Arizona Supreme Court's resolution of Petitioner's speedy trial claim was based on neither an unreasonable application of controlling Supreme Court law or an unreasonable determination of the facts. Therefore, Claim 1 is denied.

**Claim 4.1-A:  Counsel Failed to Preserve Petitioner's Right to a Speedy Trial**

Petitioner alleges that trial counsel rendered constitutionally ineffective assistance by failing to preserve his speedy trial rights.  (Dkt. 38 at 50.)  Petitioner raised this claim in his PCR petition, and the court found it both procedurally barred and meritless.  (Dkt. 63, Ex. D at 3.)

*Clearly Established Federal Law*

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced his defense.  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.* at 689.  To prove

---

[9]       In his PCR petition, Petitioner asserted that his ex-girlfriend told police and a defense investigator that he called her from a bar that night sounding "really trashed" and later came to her apartment and banged on her door.  (Dkt. 63, Ex. G at 31.)  Petitioner contends this was powerful evidence in support of his contention that he was extremely intoxicated the night of the murder.  However, Petitioner has presented nothing in the habeas record from this witness to support these assertions.  Furthermore, evidence concerning Petitioner's level of intoxication that night was presented at trial by police officers and other witnesses, none of whom believed he was intoxicated. (*See* RT 8/10/94 at 233, 255-56; RT 8/11/94 at 330.)

- 17 -

1   deficient performance, a defendant must overcome "the presumption that, under the

2   circumstances, the challenged action might be considered sound trial strategy." *Id.* To

3   demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but

4   for counsel's unprofessional errors, the result of the proceeding would have been different.

5   A reasonable probability is a probability sufficient to undermine confidence in the outcome."

6   *Id.* at 694.

7       Trial counsel has "a duty to make reasonable investigations or to make a reasonable

8   decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. To

9   determine whether the investigation was reasonable, the court "must conduct an objective

10  review of [counsel's] performance, measured for reasonableness under prevailing

11  professional norms, which includes a context-dependent consideration of the challenged

12  conduct as seen from counsel's perspective at the time." *Wiggins v. Smith*, 539 U.S. 510, 523

13  (2003) (citation and quotation marks omitted). The Supreme Court has reiterated that "[i]n

14  judging the defense's investigation, as in applying *Strickland* generally, hindsight is

15  discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions

16  are made and by giving a 'heavy measure of deference to counsel's judgments.'" *Rompilla*

17  *v. Beard*, 545 U.S. 374, 381 (2005) (quoting *Strickland*, 466 U.S. at 689, 691). Moreover,

18  under the AEDPA, a "doubly deferential" standard applies to this Court's review of IAC

19  claims. *Knowles v. Mirzayance*, ___ U.S. ___, 129 S. Ct. 1411, 1420 (2009).

20      A court need not address both components of the *Strickland* inquiry, or follow any

21  particular order. If it is easier to dispose of an ineffectiveness claim based on lack of

22  prejudice, without first evaluating counsel's performance, that course should be followed.

23  *Strickland*, 466 U.S. at 697.

24      *Analysis*

25  In denying relief on this claim, the state PCR court ruled:

26  The lengthy pretrial period – five years from arraignment to trial – was
    analyzed and discussed in detail by the Arizona Supreme Court, which rejected
27  Petitioner's claim of speedy trial violations under Rule 8 and the Sixth

28                                          - 18 -

1

2

3

4

> Amendment theories.  The Supreme Court found that Petitioner himself waived his speedy trial rights under Rule 8; furthermore, the Court noted that Petitioner did not complain about the delay until just before trial.  The Court found that counsel was not deficient for failing to protest the delay, much less that counsel's performance prejudiced the Petitioner.  See the discussion in *Spreitz*, 190 Ariz. at 136-40.

(Dkt. 63, Ex. D at 3-4 (footnote omitted).)

5

6

7

8

9

10

This Court agrees that counsel's failure to file a "timely" speedy trial motion did not constitute ineffective assistance of counsel.  In light of Petitioner's taped confession that he killed Ruby Reid, the defense strategy was to admit to the murder but argue it was neither premeditated nor committed in furtherance of a kidnapping and/or sexual assault, thus negating the elements of first degree murder. (*See* RT 8/10/94 at 211-18; RT 8/17/94 at 693-733.)

11

12

13

14

15

16

17

18

19

20

21

The evidence supporting both premeditation and felony murder was circumstantial. Blood found in the trunk of Petitioner's car constituted the strongest evidence for kidnapping, one of the predicate felonies, and further supported the State's argument that Reid's sexual assault and death were planned by Petitioner and not a product of the heat of the moment. However, the blood was not positively identified.  At trial, the defense argued  that the evidence to support kidnapping was speculative.  Although the precise nature of the DNA evidence is not revealed in the habeas record, the State, in its motion seeking admission of the evidence, characterized the evidence as establishing that the victim's blood was present in both the interior and the trunk of Petitioner's car, a characterization Petitioner does not dispute.  (ROA at 210.)

22

23

24

25

26

27

Evidence confirming that the blood belonged to Reid would have solidified the kidnapping theory advanced by the State.  It also would have bolstered the findings made by the state courts that the murder satisfied the requirements for the "cruelty" aggravator by reinforcing the notion that Petitioner inflicted "mental anguish or physical abuse before the victim's death" and that she consciously experienced "significant uncertainty as to [her] fate" before she was killed. *Spreitz*, 190 Ariz. at 147, 945 P.2d at 1278.  Therefore, preventing the

28

1  admission of definitive evidence that the blood in Petitioner's car and trunk belonged to the

2  victim was important in furthering Petitioner's defense that she had voluntarily accompanied

3  him to have sex and that her death occurred in a sudden, unplanned manner.

4       In addition, there is no evidence that Petitioner himself objected to counsel's strategy

5  during the nearly five years the admissibility of the DNA evidence was being litigated.  As

6  already noted, Petitioner expressly consented to continuances up to April 23, 1991,

7  occasioning nearly two years of delay.

8       On March 3, 1993, Petitioner did voice concerns to the trial court about the delay and

9  seeming inaction in his case.  He felt that his counsel, Marshall Tandy, had not been working

10  on his case during the eighteen months since his appointment.  (RT 3/3/93 at 2, 5.)   At a

11  hearing, the court asked counsel to confer with Petitioner and continued the matter for two

12  weeks.  (*Id.* at 4.)  At a subsequent hearing, Petitioner stated:

13         Marshall and I have been talking, and he explained what had been going on,
           and I just – he explained if he was around, that he could – that way he could

14         explain the DNA stuff a little bit better, to me, because Ms. Sotelo is on a
           higher plane, with me, and she just goes over my head, and Mr. Tandy could

15         interpret it.

16  (RT 3/19/93 at 3.)  Petitioner then withdrew his motion for a new lawyer, stating "I'll stay

17  with Marshall Tandy."  (*Id.* at 7.)  Thus, it appears at that point that he re-affirmed counsel's

18  strategy to waive his speedy trial rights while Ms. Sotelo contested the admissibility of the

19  State's DNA evidence even though the case had been pending for nearly four years.

20       Finally, as discussed in addressing Claim 1, other than the fact of the delay, which

21  was clearly lengthy, Petitioner cannot point to specific prejudice.  He makes conclusory,

22  unsupported assertions that counsel failed during this period to interview witnesses and

23  follow up on information from mental health experts "to correct their mis-impressions as to

24  the facts of Chris' life via a thorough investigation."  (Dkt. 38 at 52.)  However, he does not

25  specify what witnesses, expert or otherwise, counsel failed to interview and what information

26  they could have provided.  Moreover, it is unclear how counsel's decision to waive

27  Petitioner's speedy trial rights and contest the admission of DNA evidence impacted these

28

1  alleged deficiencies.[10]

2        The Court concludes that it was not an unreasonable strategy for defense counsel to

3  vigorously challenge and oppose admission of the DNA evidence. *See Strickland*, 466 U.S.

4  at 689 (to satisfy the deficient performance prong, a defendant must overcome "the

5  presumption that, under the circumstances, the challenged action might be considered sound

6  trial strategy"). This is particularly so given that the case was a "test" case for determining

7  the use of such evidence in Arizona. Pursuing this strategy necessitated delaying trial until

8  the issue was resolved. Unfortunately, it took more than five years to do so. Even so,

9  counsel's strategy ultimately led to the exclusion of the DNA evidence at trial. For all of

10  these reasons, the PCR court's denial of this claim was neither contrary to nor an

11  unreasonable application of *Strickland.* Claim 4.1-A is denied.

12            **Claim 2:**      **Petitioner's Right to Due Process of Law was Violated by the**
                                       **Admission of Gruesome Photographs**

13
14        Prior to the medical examiner's testimony, the prosecution sought to introduce several

15  photographs taken during the autopsy that depicted Reid's badly decomposed body,

16  including pictures of her upper torso and head. (RT 8/16/94 at 586-92.) The prosecutor

17  conceded that the photographs were gruesome but argued they depicted multiple bruising on

18  the body which, while not illustrative of how the victim died, provided circumstantial

19  evidence of forcible sexual assault and thus contradicted Petitioner's claims of consensual

20  sex. (*Id.* at 592.) The trial court found the photographs "shocking" but concluded they were

21  relevant and should be admitted. (*Id.* at 593.)

22        On appeal, the Arizona Supreme Court disagreed. Applying Rule 403 of the Arizona

23

24       [10]      To the extent Petitioner reiterates claims that counsel was ineffective in failing

25  to develop mitigation witnesses to "humanize" him, or to investigate and present evidence
concerning his head injuries, childhood abuse, and level of intoxication, those allegations

26  were presented in Claims 4.2-B, 4.2-C, 4.2-D, and 4.2-E of the amended habeas petition and
denied by the Court in its order denying Petitioner's renewed motion for an evidentiary

27  hearing. (Dkt. 89.)

28

1    Rules of Evidence, the court found that the trial court had erred in admitting the autopsy

2    photos because the danger of unfair prejudicial effect on the jury outweighed the exhibits'

3    probative value. *Spreitz*, 190 Ariz. at 141-42, 945 P.2d at 1272-73.  However, the court

4    determined that the error did not violate Petitioner's right to a fair trial under the federal

5    constitution:

6         While it is impossible to assess the precise effect viewing the most gruesome
          autopsy photographs might have had on the jury, we have no difficulty
7         concluding beyond a reasonable doubt by reason of the overwhelming
          evidence against the defendant, including, most importantly, his own
8         uncoerced confession, that the jury would have found him guilty without the
          photographs. We thus find the trial court's discretionary error in admitting the
9         autopsy photographs harmless.

10   *Id*. at 142, 945 P.2d at 1273.

11        Petitioner argues that the admission of the autopsy photos inflamed the jury's passions

12   and violated his Fourteenth Amendment right to a fair trial.  (Dkt. 38 at 35.)  Petitioner has

13   not proffered copies of the relevant exhibits but, according to the Arizona Supreme Court,

14   the photographs

15        depict the corpse as it appeared after decomposing in the desert for over three
          days in temperatures exceeding 100°F.  The corpse is severely discolored, and
16        in all of the photographs insects are shown partly covering the body.  This
          insect activity is vividly apparent in the close-ups.  Perhaps the most disturbing
17        photograph, marked Exhibit 156, depicts the victim's face staring at the
          camera in a mummy-like mask of death.
18
     *Spreitz*, 190 Ariz. at 140, 945 P.2d at 1271.
19
20        The admission of photographs is a state law matter that "lies largely within the

     discretion of the trial court," *Batchelor v. Cupp*, 693 F.2d 859, 865 (9th Cir. 1982), and only
21
     if the admission of the evidence was so prejudicial as to offend due process may the federal
22
     courts consider it on habeas review.  *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991); *see also*
23
     *Gerlaugh v. Stewart*, 129 F.3d 1027, 1032 (9th Cir. 1997) (finding claim not cognizable
24
     where admission of gruesome photographs did not implicate fundamental unfairness).  Even
25
     if photographs are improperly admitted, such error will be deemed harmless unless the
26
     petitioner can establish that their admission had a substantial and injurious effect on the
27

28                                          - 22 -

1    jury's verdict.  *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

2           While Petitioner cites no case in which habeas relief was granted based on the

3    admission of gruesome photographs, courts have consistently held that admission of

4    photographs that are "at least arguably relevant and probative" does not violate due process.

5    *Kuntzelman v. Black*, 774 F.2d 291, 292 (8th Cir. 1985); *see Villafuerte v. Lewis*, 75 F.3d

6    1330, 1343 (9th Cir. 1996) (photos relevant to prove that defendant knowingly restrained the

7    victim); *Thornburg v. Mullin*, 422 F.3d 1113, 1129 (10th Cir. 2005) (no due process violation

8    where petitioner challenged the admission of six photographs "depicting the charred remains

9    of the victims' bodies"; despite the fact that the petitioner did not dispute the manner of

10   death, "the state still bore the burden to convince the jury that its witnesses, both

11   eyewitnesses and experts, provided an accurate account of events"); *Biros v. Bagley*, 422

12   F.3d 379, 391 (6th Cir. 2005) (gruesome photos were probative of state's theory that

13   petitioner meticulously dissected victim and did not act in a blind rage); *Willingham v.*

14   *Mullin,* 296 F.3d 917, 928-29 (10th Cir. 2002) (denying claim that the admission of 22

15   photos of the murder victim's body was so unduly prejudicial as to render his trial

16   fundamentally unfair, where photos relevant to issue of intent).

17          As the Arizona Supreme Court stated, there is little question that the contested photos

18   were relevant to show the fact and cause of Reid's death.  *Spreitz*, 190 Ariz. at 142, 945 P.2d

19   at 1273.  Although the state supreme court also determined that the gruesome character of

20   the photos outweighed their minimal probative value, this does not necessarily establish a

21   due process violation.  Moreover, the admission of the photographs was harmless in light of

22   the overwhelming evidence of guilt presented at trial.   This included, most notably,

23   Petitioner's detailed confession, as well as an array of physical evidence circumstantially

24   tying Petitioner to the crime scene.

25          Under these circumstances, the Court finds that the admission of the autopsy

26   photographs did not have a substantial and injurious effect on the jury's verdict.  *See Futch*

27   *v. Dugger*, 874 F.2d 1483, 1487-88 (11th Cir. 1989) ("[B]ecause there was overwhelming

28
                                              - 23 -

1    evidence of guilt, the photograph [showing nude victim's gunshot wounds] was not a

2    'crucial, critical, highly significant factor' in petitioner's conviction.").   The Arizona

3    Supreme Court's conclusion that the admission of the autopsy photographs was

4    constitutionally harmless was neither contrary to nor an unreasonable application of clearly

5    established federal law.  Claim 2 is denied.

6    **Claim 3:**            **The Court's Instructions to the Jury Violated**
                             **Petitioner's Right to a Fair Trial**
7
     **Claim 4.1-G:**        **Trial Counsel was Ineffective in Failing to Request**
8                            **Certain Jury Instructions or to Object to Certain Others**

9    **Claim 4.3-A:**        **Appellate Counsel was Ineffective in Failing to Request**
                             **Certain Jury Instructions or to Object to Certain Others**
10
          In Claim 3, Petitioner presents three separate claims. He alleges that his constitutional
11
     rights were violated by the trial court's instructions on premeditation and felony murder and
12
     by the court's failure to instruct the jury that it did not have to return a verdict if it was unable
13
     to do so. (Dkt. 38 at 38-45.)  In Claim 4.1-G, Petitioner asserts ineffective assistance of trial
14
     counsel for failing to object to the court's premeditation and felony murder instructions and
15
     to request an instruction that the jury did not have to return a verdict. (*Id.* at 68-70.)  In
16
     Claim 4.3-A, Petitioner complains that appellate counsel likewise performed deficiently for
17
     failing to raise these jury instruction issues on direct appeal. (*Id.* at 98.)
18
          *Procedural Status*
19
          The substantive instructional errors raised as Claim 3 were never presented on direct
20
     appeal.  Instead, Petitioner presented them in his PCR petition. (Dkt. 63, Ex. G at 54-58.)
21
     Although the PCR court alternatively discussed the merits of Petitioner's claims, denying
22
     them in summary fashion, the court first found the claims precluded under Rule 32.2(a)(3)
23
     of the Arizona Rules of Criminal Procedure because they could have been raised on direct
24
     appeal. (Dkt. 63, Ex. D at 15-16.)   Thus, the state court "explicitly invoke[d] a state
25

26

27

28
                                         - 24 -

1    procedural bar as a separate basis for decision."[11]  *Harris v. Reed*, 489 U.S. 255, 264 n.10

2    (1989).  This preclusion ruling rests on an independent and adequate state procedural bar.

3    *See Stewart v. Smith*, 536 U.S. 856, 860 (2002) (per curiam) (Rule 32.2(a) is independent of

4    federal law); *Ortiz*, 149 F.3d at 931-32 (Rule 32.2(a) is regularly and consistently applied).

5    Therefore, Claim 3 is procedurally barred, absent a showing of cause and prejudice or a

6    fundamental miscarriage of justice.

7           Petitioner has not asserted cause for his failure to properly exhaust Claim 3; nor has

8    he attempted to demonstrate that a fundamental miscarriage of justice will occur if Claim 3

9    is not addressed on the merits.  Although Petitioner does not expressly assert trial or appellate

10   IAC as cause, such allegations were themselves properly exhausted during his PCR

11   proceedings and, if meritorious, could potentially serve as cause to overcome the default of

12   Claim 3.  Accordingly, the Court turns to the merits of these IAC allegations.

13          Premedition Instruction

14          The trial court gave the following jury instruction:

15                 "Premedition" means that the defendant acts with either the intention
              or the knowledge that he will kill another human being, when such intention
16            or knowledge precedes the killing by a length of time to permit reflection.  An
              act is not done with premedition it if is the instant effect of a sudden quarrel
17            or heat of passion.

18   (RT 8/17/94 at 670-71.)  Defense counsel did not object to this instruction, and appellate

19   counsel did not raise on appeal any issues concerning it.  In finding that neither trial nor

20   appellate counsel's representation was deficient in this regard, the PCR court ruled that there

21   was no error in giving the instruction.  (Dkt. 63, Ex. D at 7-8, 13, 15.)

22          Petitioner acknowledges that the court's instruction accurately reflected the statutory

23

24          [11]    On petition for review of the PCR court's ruling, the Arizona Supreme Court
     agreed to consider only whether the trial court properly determined that Petitioner's claims
25   of ineffective assistance of counsel were precluded because they had not been raised on
     direct appeal.  The court summarily denied review on all other claims without comment.
26   Thus, with respect to Claim 3, the PCR court's ruling is the last reasoned determination by
     a state court.
27

28

1  definition in effect at the time of his trial[12] but argues that the instruction violated his federal

2  constitutional rights because it relieved the state of its burden of proving the element of

3  actual reflection necessary for first degree murder. (Dkt. 38 at 38-39.) Therefore, Petitioner

4  contends, counsel were deficient for not alerting the trial and appellate courts to this issue.

5  The Court disagrees.

6       The trial court's premeditation instruction did not render Petitioner's trial

7  fundamentally unfair. The instruction does not, on its face, permit a finding of premeditation

8  based solely on the passage of time, but specifically states that first degree murder requires

9  "intention" that the defendant will kill under a circumstance which "permits reflection." *See*

10 *State v. Thompson*, 204 Ariz. 471, 479, 65 P.3d 420, 428 (2003) (holding that the statutory

11 definition of premeditation requires actual reflection and not the mere passage of time).

12 Thus, the instruction explicitly distinguishes intent as existing before, and as something

13 distinct from, reflection. The instruction clarifies that impulsive acts do not satisfy the

14 premeditation requirement by excluding acts committed as "the instant effect of a sudden

15 quarrel or heat of passion." Finally, nothing in the prosecutor's argument or the remainder

16 of the court's instructions inaccurately suggested that the State needed only to prove the time

17 element of reflection in lieu of actual premeditation.

18      Secondarily, Petitioner was unanimously convicted of both premeditated and felony

19 murder, and premeditation is not an element of felony murder. As a result, any error

20 regarding the premeditation instruction did not so infect the trial with error that it rendered

21 Petitioner's first degree murder conviction a denial of due process. Therefore, neither trial

22

23
        [12]     Pursuant to A.R.S. § 13-1105(A)(1), "A person commits first-degree murder

24 if: Intending or knowing that the person's conduct will cause death, the person causes the
   death of another person . . . with premeditation." A defendant kills with premeditation if he

25 "acts with either the intention or the knowledge that he will kill another human being, when

26 such intention or knowledge precedes the killing by a length of time to permit reflection. An
   act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of

27 passion." A.R.S. § 13-1101(1).

28
                                      - 26 -

1  nor appellate counsel were ineffective for failing to alert the trial and appellate courts to

2  Petitioner's federal constitutional concerns regarding the premeditation jury instruction.

3  <u>Felony Murder Instruction</u>

4  The trial court gave the following instructions concerning felony murder:

5  There are two separate definitions of first degree murder. . . .

6  . . . .

7  The second is when such a person commits or attempts to commit
   sexual assault or kidnapping and in the course of, and in the furtherance of
8  such offense, or immediate flight from such offense, such person causes the
   death of any person. This type of first degree murder requires no specific
9  mental state other than that which is required for the commission of sexual
   assault or kidnapping.
10
   . . . .
11
   With respect to the felony murder rule, insofar as it provides the basis
12  for a charge of first degree murder, it is the law that there is no requirement
   that the killing occurred "while committing" or "engaged in" the felony, or that
13  the killing be a part of the felony.  The homicide need not have been
   committed to perpetrate the felony.
14
   It is enough if the felony and the killing were part of the same series of
15  events.

16  (RT 8/17/94 at 670-71, 673.) Defense counsel did not object to this instruction, and appellate

17  counsel did not raise on appeal any issues concerning it.  In finding that neither trial nor

18  appellate counsel's representation was deficient in this regard, the PCR court ruled that there

19  was no error in giving the instruction.  (Dkt. 63, Ex. D at 7-8, 13, 15.)

20  Citing Arizona law, Petitioner contends this instruction was flawed:

21  While the court correctly instructed the jury that the state was required to
   prove that the death was "in the course of" and "in furtherance of" the crimes
22  of sexual assault or kidnapping, the complained of instruction relieved the state
   of proving both elements of felony murder by stating that there is no
23  requirement that the killing occurred "while engaged in the felony"
   (eliminating the "in the course of" requirement) and by stating that "it is
24  enough if the felony and the killing were part of the same series of events."
   (eliminating the requirements that the killing occur "in the course of" a sexual
25  assault or kidnapping and be "in furtherance of" such crime(s) or immediate
   flight therefrom).
26
   (Dkt. 38 at 41-42) (citations omitted).  Therefore, Petitioner contends, counsel were deficient
27

28  - 27 -

1    for not alerting the trial and appellate courts to this issue.  The Court disagrees.

2           In determining that the felony murder instruction was proper, the PCR court cited

3    *State v. Miles*, 186 Ariz. 10, 918 P.2d 1028 (1996).  (Dkt. 63, Ex. D at 15.)  In *Miles*, the

4    Arizona Supreme Court upheld a felony murder instruction virtually identical to the one used

5    here, although, as Petitioner notes, the court did discourage the use of the phrase *"[i]t is*

6    *enough if the felony and the killing were part of the same series of events.*"  186 Ariz. at 15,

7    918 P.2d at 1033.

8           Petitioner argues that the *Miles* court erred in upholding this instruction.  However,

9    it is not for this Court to reexamine the correctness of state court rulings on state law matters.

10   *See Estelle*, 502 U.S. at 67-68.  Petitioner concedes that *Miles* upheld the instruction to which

11   he now objects.  Therefore, he cannot show that trial and appellate counsel were ineffective

12   for not challenging the court's instruction on felony murder.

13          Lack of Instruction on Returning Verdict

14          Petitioner alleges that his rights were violated because the trial court failed to instruct

15   the jurors that they need not return a verdict if they are unable to do so.  The PCR court

16   rejected this claim in summary fashion, stating simply that there is "absolutely" no such

17   requirement and citing in support *State v. Thomas*, 133 Ariz. 533, 652 P.2d 1380 (1982),

18   which held that a trial court's failure to instruct the jury that it was not required to return a

19   verdict is not error. (Dkt. 63, Ex. D at 15-16.)

20          In support of this claim, Petitioner cites language in the instructions informing the jury

21   that to reach a verdict "[a]ll twelve jurors must agree on a verdict."  (RT 8/17/94 at 750.)

22   The Court disagrees that this was tantamount to telling the jury it had to reach a verdict.

23   Rather, it merely informed the jurors that in order to reach a verdict they must agree

24   unanimously.  Petitioner has failed to show that trial and appellate counsel were ineffective

25   for failing to challenge this instruction.

26          Conclusion

27          Because the court's instructions were not erroneous and Petitioner was not entitled to

28

an instruction that the jury need not return a verdict, he has failed to establish prejudice from either trial or appellate counsel's inactions with regard to the jury instructions. *See Gonzalez v. Knowles*, 515 F.3d 1006, 1017 (9th Cir. 2008) (counsel cannot be deemed ineffective for failing to raise claims which have no merit); *Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001) (appellate counsel may not be held ineffective for failing to raise claims that have no merit). Therefore, Petitioner has failed to establish cause and prejudice for the default of Claim 3. Furthermore, because the PCR court's denial of Petitioner's IAC claims was not based on an unreasonable application of law or determination of fact, Petitioner is not entitled to habeas relief on Claims 4.1-G or 4.3-A.

**Claim 4.1-C:**   **Counsel Never Objected to Irrelevant and Highly Prejudicial Testimony Regarding Homosexuals**

As recounted above, Sgt. Chacon encountered Petitioner during a traffic stop shortly after the murder. (RT 8/10/94 at 244.) Chacon was struck by the fact Petitioner was covered in blood and fecal matter and asked him what happened. Petitioner told him that he was involved in a fight at a nearby convenience store. (*Id.* at 248.) Chacon noticed that although Petitioner was covered in blood he had no injuries. Petitioner explained that the blood was from his opponent. (*Id.*)

Chacon then drove to the area of the purported fight. (RT 8/10/94 at 249.) He saw no signs of an altercation and returned to the scene of the traffic stop. (*Id.* at 250.) He spoke again with Petitioner, questioning him about the fecal matter. (*Id.*) Chacon then asked Petitioner if he was gay, to which Petitioner replied "a little bit." (*Id.* at 251. ) When the prosecutor questioned Chacon as to why he had asked Petitioner if he was gay, Chacon explained: "Well, there is a sex act that, I guess, homosexuals involve in where they insert their hand or an arm into their partners rectum and there is some transference of fecal matter sometimes or most of the time." (*Id.* at 251-52.)

Petitioner contends that trial counsel was ineffective for failing to object "to this unbelievably prejudicial and totally irrelevant evidence" and that this line of questioning

served only to disgust jurors and prejudice them against him.  (Dkt. 38 at 58.)  The PCR court denied relief on this claim, determining that the testimony, even if improper, was harmless in light of the overwhelming evidence of Petitioner's guilt.  (Dkt. 63, Ex. D at 5-6.)

Even assuming counsel was ineffective for failing to object to this line of questioning, the Court agrees that Petitioner cannot establish prejudice from Sgt. Chacon's testimony.  As previously recounted, the evidence of Petitioner's guilt, consisting chiefly of his confession and corroborating physical evidence, was overwhelming.  His confession demonstrated to the jury that the story he told officers about a fight with a black man was a contrivance. Petitioner cannot show a reasonable probability that, if counsel had objected to this aspect of Sgt. Chacon's testimony, he would not have been convicted.  The PCR court's denial of this claim was neither contrary to nor an unreasonable application of *Strickland*, and Claim 4.1-C is denied.

**Claim 4.1-D:     Counsel Never Had a Theory of the Defense and Failed to Present Any Witnesses or Give Petitioner the Opportunity to Participate in that Decision**

Petitioner alleges that counsel failed to develop a defense theory.  According to Petitioner, defense counsel, after conceding guilt in his opening statement, only "lamely" suggested "a lesser degree of homicide than first degree murder" and ignored the "obvious" defense of temporary insanity.  Petitioner asserts that this amounts to ineffective assistance of counsel.[13]  (Dkt. 38 at 60-61.)

The defense rested without calling any witnesses.  In his closing argument, counsel did not contest that Petitioner had killed Reid; rather, he argued that there was no evidence establishing that Reid went with Petitioner unwillingly, that any sexual relations between them were forced, or that the killing was premeditated.  (RT 8/17/94 at 697-708, 720-32.)

---

[13]     Petitioner raised a separate claim alleging that trial counsel was ineffective for failing to pursue a temporary insanity defense.  (Dkt. 38 at 54-57.)  The Court previously addressed this claim in detail and concluded that it was without merit.  (Dkt. 89 at 15-19.)

1  Counsel argued that, at most, the evidence established second degree murder or

2  manslaughter.  (*Id.* at 697, 732.)

3          In denying relief on this IAC claim, the PCR court stated:

4          Trial counsel obviously understood and accepted the fact that the evidence
           overwhelmingly demonstrated Petitioner's responsibility for the victim's
5          death.  The most sound and realistic strategy, in terms of defending Petitioner
           at his trial, was to simply admit Petitioner's responsibility for the victim's
6          death but to make every effort to negate any premeditation (and thus probably
           preclude a conviction on first degree murder).

7
   (Dkt. 63, Ex. D at 6.)
8
           The Court disagrees with Petitioner's claim that counsel never developed a defense
9
   theory.  As noted by the PCR court, counsel's strategy was to admit responsibility for killing
10
   the victim but to argue that it was not premeditated or done in connection with a kidnapping
11
   or sexual assault and thus was not first degree murder.
12
           Moreover, other than asserting that counsel should have done more to develop a
13
   defense, Petitioner fails to explain what counsel should or could have done to present a
14
   different, viable defense to the murder.  He argues that counsel never consulted with him
15
   properly about witnesses or about whether he would testify at trial.  However, as noted by
16
   the PCR court, nothing in the record indicates Petitioner wanted to testify but was dissuaded
17
   from doing so; nor has Petitioner explained what witnesses counsel should have presented
18
   at trial but did not, or how these witnesses would have helped the case.
19
           In light of these circumstances, and given Petitioner's detailed confession to the crime,
20
   Petitioner cannot show that defense counsel's strategy was irrational or prejudicial.  *See*
21
   *United States v. Thomas*, 417 F.3d 1053, 1059 (9th Cir. 2005) (no showing of prejudice
22
   based on counsel's strategy of conceding guilt on charge supported by overwhelming
23
   evidence in an attempt to maintain credibility and avoid conviction on more serious charge)
24
   (citing *Florida v. Nixon*, 543 U.S. 175 (2004)); *see also Parker v. Head*, 244 F.3d 831, 840
25
   (11th Cir. 2001) (counsel's strategic decision to concede defendant's guilt did not amount
26
   to ineffective assistance in light of overwhelming evidence of guilt, including defendant's
27

28
                                        - 31 -

1    admissible confession); *Trice v. Ward,* 196 F.3d 1151, 1162 (10th Cir. 1999) (given

2    overwhelming evidence of guilt "it was an entirely reasonable strategy for [defendant's] trial

3    counsel to concede [that defendant raped the victim] and focus his efforts on persuading the

4    jury that [the defendant] did not have the intent to commit first-degree murder, and/or

5    persuading the jury to spare [his] life").

6        Petitioner cannot establish ineffective assistance of counsel. The PCR court's denial

7    of this claim was neither contrary to nor an unreasonable application of *Strickland*, and the

8    claim is denied.

9        **Claim 4.1-F:  Counsel Failed to Aggressively Pursue a Plea Bargain**

10       Petitioner asserts that counsel rendered ineffective assistance because he never

11   pursued a plea bargain.  He argues that if this case had not been delayed to litigate the

12   question of the admissibility of DNA evidence, the state would have offered him a plea

13   bargain.  (Dkt. 38 at 67.)  The PCR court denied relief on this claim, stating:

14       There is no evidence whatsoever that the State would have, at any time,
         offered him a plea bargain.  Thus, Petitioner's claim that the State would have
15       offered the Petitioner a plea bargain is pure speculation and does not give rise
         to any colorable claim.  Furthermore, a defendant in a criminal case has no
16       constitutional right to a plea agreement.

17   (Dkt. 63, Ex. D at 7 (citations omitted).)

18       The Court has already noted that counsel pursued a reasonable strategy in challenging

19   the admissibility of the DNA evidence.  In addition, Petitioner has presented no evidence that

20   the State was willing to make a plea bargain or made a plea offer that counsel rejected

21   without seeking Petitioner's input.  The assertion that the State would have offered a plea

22   deal if the case had not been delayed to litigate the DNA evidence is pure speculation.  *See*

23   *Burger v. Kemp*, 483 U.S. 776, 785 (1987) (IAC not established where "[the notion that the

24   prosecutor would have been receptive to a plea bargain is completely unsupported in the

25   record"); *Eisemann v. Herbert*, 401 F.3d 102, 109-10 (2d Cir. 2005).  The decision of the

26   state court denying this claim was neither contrary to nor an unreasonable application of

27   *Strickland*, and Claim 4.1-F is denied.

28

1    **II.    SENTENCING-RELATED CLAIMS**

2    Following conviction and in preparation for sentencing by the trial judge, the defense

3    enlisted the services of Dr. Todd Flynn, a forensic psychologist. Dr. Flynn met with

4    Petitioner, interviewed family members, reviewed numerous documents, and concluded that

5    Petitioner likely experienced an uncontrollable outburst of aggression at the time of the

6    offense. (Dkt. 63, Ex. M at 9.) He further opined that Petitioner's young age at the time of

7    the crime (twenty-two), combined with his social and emotional immaturity, should be

8    weighed in mitigation, along with the absence of any prior violent behavior, the absence of

9    Antisocial Personality Disorder, the failure of Petitioner's parents to provide treatment for

10    alcohol abuse (which contributed to years of intoxication and the resulting conduct), and an

11    "emotionally deprived, physically punitive home environment." (*Id.* at 10-11.) In Dr.

12    Flynn's view, these factors distinguished Petitioner from a "habitually violent, conscienceless

13    victimizer of others." (*Id.* at 12.)

14    Petitioner was also interviewed by a probation officer, who prepared a presentence

15    report (PSR) for the trial court. Petitioner reported that on the night of the offense he and his

16    roommate had been drinking heavily at a bar selling five-cent beers. (PSR at 3.) He lost

17    count and did not know how many were consumed. (*Id.*) He returned home, called his

18    girlfriend Lucy Eremic several times, then left to go to her place. (*Id.*) On the way, he

19    stopped for more beer and encountered a stranger to whom he gave a ride and shared a

20    "couple quick lines" of cocaine. (*Id.*) When he got to Eremic's home, she did not answer

21    the door. (*Id.*) Petitioner left, drove down the road, and spotted Reid sitting on a curb. (*Id.*)

22    They talked and agreed to go drinking together, and ended up in the desert where they

23    engaged in "heavy petting." (*Id.* at 3-4.) Petitioner told the probation officer he could not

24    remember the exact sequence of events but recalled that the victim had started yelling at him

25    so he hit her. (*Id.* at 4.) He claimed things were "foggy" when he was pulled over by police

26    but now realized that "a lady died, that really sucks. It was senseless that she died." (*Id.*)

27    Attached to the PSR were numerous letters written on Petitioner's behalf. Petitioner's

28

mother described him as sensitive, helpful, caring, and protective of his younger sisters.  She urged the court to consider the significant role alcohol and drugs played in the offense. Petitioner's step-uncle and aunt described Petitioner's home life and offered their opinion that he was a sensitive person who was neglected as a child and not given any guidance or emotional support from either his domineering mother or his stepfather.  Petitioner's sister wrote that she and Petitioner were belittled daily by their mother, who verbally abused them and played mind games.  She also described physical abuse, stating that their mother would hit Petitioner with whatever she could get her hands on.  Lucy Eremic relayed that, although she and Petitioner had only a brief relationship, he was a good person who treated her with respect and compassion.  A jail chaplain wrote that, during Petitioner's five-year stay at the Pima County Adult Detention Center, he attended religious services, was receptive to one-on-one counseling, and got along well with others.  A jail educator reported that Petitioner earned a GED while in jail pending trial and that he was pleasant, cooperative, and helpful in class.

Petitioner also wrote a letter to the trial judge.  He expressed remorse for the victim's senseless death, acknowledged his alcoholism, and said he had learned much about himself during pretrial incarceration.

Prior to the aggravation/mitigation hearing, defense counsel filed a sentencing memorandum outlining the mitigating factors he believed the court should consider.  The memorandum pointed to Dr. Flynn's report as persuasive evidence concerning Petitioner's state of mind during the offense.  (Dkt. 63, Ex. L at 2.)  The memorandum also argued that sufficient evidence established numerous other mitigating factors related to Petitioner's upbringing, including a disruptive middle childhood, a punitive and abusive childhood, an emotionally cold mother, poor social adjustment with peers, the absence of a healthy male role model, drug and alcohol abuse, abandonment by his mother as a teenager, and a persistent pattern of rejection.  (*Id.* at 2-3.)  In addition, the memorandum asserted as mitigation Petitioner's remorse, "newfound set of beliefs and values," cooperation with jail

authorities during the lengthy pretrial period, lack of a criminal record, young age and relative immaturity, lack of education, impairment due to alcohol and dysfunctional upbringing, lack of dangerousness and propensity for violence, and good character. (*Id.* at 6, 9-12.)

At the aggravation/mitigation hearing, counsel presented three witnesses: Dr. Flynn and two corrections officers. (RT 11/28/94.) Dr. Flynn testified primarily about the findings in his report. (*Id.* at 6-52.) The corrections officers testified to Petitioner's passive nature and the fact that he lacked major disciplinary write-ups during his five years of incarceration pending trial. (*Id.* at 54, 58-59.) The State presented no evidence, relying on the evidence submitted at trial to establish that the murder was committed in an especially cruel manner under A.R.S. § 13-703(F)(6).

At the sentencing hearing several weeks later, defense counsel argued against the (F)(6) factor and urged the court to consider the cumulative effect of the mitigation evidence. (RT 12/21/94.) In particular, counsel highlighted the letters from Petitioner's sister and mother to emphasize Petitioner's dysfunctional upbringing. (*Id.* at 8-9.) Petitioner also spoke, apologizing to the victim's family for causing her death, stating that his background was not an excuse for committing murder, and asking for the opportunity to improve himself in prison. (*Id.* at 12.)

Following a recess to consider the arguments of counsel, the trial court determined that the mitigation presented did not outweigh the aggravation and sentenced Petitioner to death. (*Id.* at 36.) In aggravation, the court determined that:

> the victim was picked up at some point in the city, . . . put in the trunk and she may have been even beaten at that point. There is blood on the lid of the trunk which would suggest that maybe she was sitting up or trying to get up and the trunk lid was slammed on her.
>
> I find that at the scene she was taken out of the trunk, she was thoroughly beaten, in fact five ribs were broken. There were numerous bruises and grab marks, I think in the autopsy it showed that there were eighteen that could be found.
>
> There was internal bleeding, there was internal bruising, there was a

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

broken jaw.  In addition to the death causing wounds to the head.

She was sexually assaulted, it is obvious that the victim in this case was terror stricken, having been put in a trunk, carted across town into the desert, in areas several miles from the probable pickup point.

And there was feces on her pants, the defendant was covered with feces, the defendant was covered with blood.  I am satisfied beyond a reasonable doubt there are those elements of cruelty.

I think another thing that is important in this also, the victim was a relatively small person, approximately five feet or less in height, and very slender, while the defendant is a man six feet tall, in the neighborhood of 200 pounds.

(*Id.* at 32.)

In mitigation, the court quoted from Dr. Flynn's report and found that Petitioner had established that he "suffered a disruptive childhood with a punitive cold mother, poor social judgment, drinking from the age of ten on, a mother that he could not please no matter what he did." (*Id.* at 33.)  The court further noted that Petitioner's "life turned to substance abuse, alcohol and there is some suggestion that he was using cocaine or other drugs."  (*Id.*) However, the court determined, based primarily on testimony from the police officers who had stopped Petitioner shortly after the crime, that neither intoxication nor substance abuse had impaired Petitioner's capacity to appreciate the wrongfulness of his conduct to any significant degree. (*Id.* at 34.)  The court acknowledged Petitioner's emotional growth while in jail as well as his relative immaturity at the time of the offense, but concluded neither were significant factors.  The court also found as mitigating Petitioner's lack of criminal record, lack of violent propensity, and prospects for rehabilitation. (*Id.* at 35.)  However, the court disagreed that Petitioner did not pose a threat of future violence and concluded that the "situational stress built up including rejection by his mother and his girlfriend and again that night coupled with poorly developed coping skills and alcohol" was not sufficient to "mitigate the act." (*Id.*)

On direct appeal, the Arizona Supreme Court conducted an independent review of the aggravating and mitigating evidence. *Spreitz*, 190 Ariz. at 147-50, 945 P.2d at 1278-81.  The

- 36 -

court rejected Petitioner's argument that cruelty had not been established, finding that Petitioner had "beat[en] and raped the victim in a brutal assault that lasted many minutes before he crushed her skull." *Id.* at 148, 945 P.2d at 1279.  The court also reweighed the proven aggravating and mitigating factors and found that death was the appropriate sentence. *Id.* at 151, 945 P.2d at 1282.  In doing so, the court agreed with the trial court's mitigation findings and concluded that none of the mitigation was especially weighty.  Although not expressly addressed by the trial court, the supreme court also considered remorse in its independent reweighing, but concluded it was not compelling in light of Petitioner's failure to notify authorities of his actions when he had the opportunity to do so. *Id.* at 150, 945 P.2d at 1281.

**Claim 5:     The Trial Court Erred in Applying the "Especially  Cruel" Aggravating Factor**

Petitioner contends that the aggravating circumstance set forth in A.R.S. § 13-703(F)(6) is applied inconsistently, is overbroad, and "fails to genuinely narrow the class of persons subject to the death penalty, and as such violates the Eighth and Fourteenth Amendments to the United States Constitution."  (Dkt. 38 at 99-103, 105.)

 Respondents assert that this claim is different from the claim presented on appeal, wherein Petitioner challenged the trial court's specific factual findings in determining that the (F)(6) factor had been proven.  (Dkt. 62 at 60-61.)  The Court disagrees.  Although Petitioner did challenge the trial court's factual findings, he also raised a claim challenging the constitutional sufficiency of the "especially heinous, cruel or depraved" aggravator, arguing that it was unconstitutionally vague and failed to narrow the class of homicides eligible for the death penalty.  (Dkt. 63, Ex. C at 61-64, 71.)  Citing *State v. Gulbrandson*, 184 Ariz. 46, 72, 906 P.2d 579, 605 (1995), which in turn cited *Walton v. Arizona*, 497 U.S. 639, 655 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002), the Arizona Supreme Court denied relief.  *Spreitz*, 190 Ariz. at 151, 945 P.2d at 1282.

The Arizona Supreme Court's denial of this claim was neither contrary to nor an

1   unreasonable application of controlling Supreme Court law.  Although the United States

2   Supreme Court has found Arizona's (F)(6) aggravating factor to be facially vague, it has also

3   held that Arizona courts have sufficiently narrowed their application of the circumstance so

4   as to constitutionally channel the sentencing court's discretion.  *Walton*, 497 U.S. at 654; *see*

5   *also Lewis v. Jeffers*, 497 U.S. 764, 777-81 (1990); *Woratzeck v. Stewart*, 97 F.3d 329, 335

6   (9th Cir. 1996).  Moreover, the Ninth Circuit has explicitly rejected the argument that

7   Arizona's death penalty statute is unconstitutional because "it does not properly narrow the

8   class of death penalty recipients."  *Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998).

9           **Claim 4.2-A:      Sentencing Counsel Never Understood or Researched the
                                State's Theory of Aggravation**

10

11          Petitioner asserts that counsel rendered ineffective assistance at sentencing because

12   he "demonstrated that he did not understand the legal distinction between cruelty and heinous

13   and depraved, the other F6 factor."  (Dkt. 38 at 71.)  He contends that counsel relied on a

14   case, *State v. Gretzler*, 135 Ariz. 42, 659 P.2d 1 (1983), which was not pertinent to the

15   cruelty prong of the (F)(6) factor and failed to adequately contest the State's theory that

16   Petitioner kidnapped the victim prior to killing her.  (Dkt. 38 at 71-72.)

17          The PCR court rejected this claim:

18          The record clearly demonstrates that trial counsel (Marshall Tandy) completely
            understood that the sole aggravating factor relied upon by the State in seeking
            the death penalty was, to use counsel's own words, "the notion of cruelty."
19          The record also demonstrates that trial counsel recognized that the element of
            cruelty addresses the infliction of pain on the victim, whether it is physical or
20          mental.  In any event, the Supreme Court conducted its own independent
            review of the aggravating and mitigating factors in this matter, and having
21          done so, the Supreme Court determined that the aggravating circumstance of
            especial cruelty in Petitioner's murder of Ruby Reid outweighed all factors
22          mitigating in favor of leniency.  Thus, even if trial counsel did not completely
            understand the aspect of cruelty as an aggravating factor, or if he did not
23          adequately research it, Petitioner suffered no prejudice since the facts
            themselves warrant a finding that the murder was committed in an especially
24          cruel manner.

25   (Dkt. 63, Ex. D at 8 (citations omitted).)

26          The essence of Petitioner's claim is that counsel's efforts to refute the State's

27   allegation of cruelty were deficient.  He notes that counsel failed to argue that the criminalist

28
                                            - 38 -

1    could not identify the blood in the trunk as belonging to the victim and argues that counsel

2    conflated arguments concerning cruelty with criteria for heinousness and depravity, which

3    were not alleged.  He also contends that counsel failed to argue the fact that the victim was

4    killed with a rock found at the crime scene, thus negating premeditation.  (Dkt. 38 at 72-73.)

5          Even assuming counsel was deficient in failing to make these specific arguments,

6    Petitioner cannot establish prejudice.  The Arizona Supreme Court separately weighed the

7    evidence on appeal and concluded that it supported a finding that the murder was cruel

8    beyond a reasonable doubt.  In reaching this conclusion, the court explained:

9               To avoid a finding of physical pain and mental anguish, defendant
            suggests a scenario under which the victim was rendered unconscious before
10          suffering any of her other injuries, including broken ribs, a broken jaw, and
            internal injuries. . . .  Defendant's confession and physical evidence at the
11          scene fully discredit his version of the events.  We agree with the state that it
            strains reason to suppose that defendant, using two rocks, first knocked the
12          victim senseless with fatal blows to the head, after which her unconscious
            body was stripped naked, beaten thoroughly, raped, and dragged to its final
13          resting place.  Under this scenario, defendant must have carried the bloody
            rocks along and placed them next to the victim's body.  Ironically, if this court
14          were to accept defendant's "equally plausible" hypothesis, it would almost
            certainly then find the (F)(6) aggravating factor of depravity.  Moreover,
15          defendant ignores his own admission that he beat her *as she fought back* and
            hit her with the rock *when she would not stop yelling*.  This is clear evidence
16          of conscious suffering.

17   *Spreitz*, 190 Ariz. at 147-48, 945 P.2d 1278-79.

18          As noted by both the sentencing judge and the state supreme court, powerful evidence

19   supported a finding of cruelty.  Leaving aside the question of whether Reid willingly

20   accompanied Petitioner or instead was forced into the trunk of his car and taken to the desert,

21   the evidence presented at trial supports a finding that a protracted and brutal struggle

22   occurred at the murder scene that involved the infliction of numerous severe injuries upon

23   the victim and culminated in her sexual assault and murder.  The evidence also indicates that

24   during this struggle the victim defecated on herself and on Petitioner, supporting a

25   determination that she suffered extreme duress.  All of this evidence, irrespective of

26   counsel's alleged shortcomings, supported a finding of cruelty under Arizona law.  *Id*. at 147,

27   945 P.2d at 1278 ("A finding of cruelty is warranted when the defendant inflicts on the

28

1  victim mental anguish or physical abuse before the victim's death."). Consequently,

2  Petitioner cannot establish prejudice from counsel's alleged failures, and the PCR court's

3  denial of relief on this claim was neither contrary to nor an unreasonable application of

4  *Strickland*.

5  **Claim 6:**      **The Court Found Non-Statutory Aggravation; Namely**
6                    **that Kidnapping was an Aggravating Factor Justifying**
                     **the Death Penalty**

7  **Claim 7:**      **The Court Wrongfully Believed that Petitioner Had to**
                     **Prove He Was Intoxicated at the Time of the Murder for**
8                    **His Longstanding Alcoholism and Drug Addiction to Be**
                     **Considered a Mitigating Circumstance**
9
   **Claim 8:**      **The Court Failed to Weigh A.R.S. § 13-703(G)(1) in the**
10                   **Disjunctive**

11 **Claim 4.3-B:**  **Appellate Counsel was Ineffective for Failing to**
                     **Challenge the Sentence of the Court for the Reasons**
12                   **Stated in Claims 6, 7, and 8**

13         In Claims 6, 7, and 8, Petitioner presents three claims relating to the trial judge's

14 findings at sentencing. (Dkt. 38 at 107-12.) In Claim 4.3-B, Petitioner asserts ineffective

15 assistance of appellate counsel for failing to raise on appeal the issues presented in Claims

16 6, 7, and 8. (*Id.* at 98.)

17         *Procedural Status*

18         The substantive errors raised as Claims 6, 7, and 8 were never presented on direct

19 appeal. Instead, Petitioner presented them in his PCR petition. (Dkt. 63, Ex. G at 59-63.)

20 Although the PCR court addressed the merits of these claims, it first found each waived

21 because they could have been raised on appeal. (Dkt. 63, Ex. D at 16-18.) Thus, the state

22 court "explicitly invoke[d] a state procedural bar as a separate basis for decision." *Harris*

23 *v. Reed*, 489 U.S. at 264 n.10. This preclusion ruling rests on an independent and adequate

24 state procedural bar. *See Smith*, 536 U.S. at 860; *Ortiz*, 149 F.3d at 931-32. Therefore,

25 Claims 6, 7, and 8 are procedurally barred, absent a showing of cause and prejudice or a

26 fundamental miscarriage of justice.

27         Petitioner has not asserted cause for his failure to properly exhaust Claims 6, 7, and

28
                                          - 40 -

1    8; nor has he attempted to demonstrate that a fundamental miscarriage of justice will occur

2    if these claims are not addressed on the merits.  Although Petitioner does not expressly assert

3    appellate IAC as cause, the allegations set forth in Claim 4.3-B were themselves properly

4    exhausted during his PCR proceedings and, if meritorious, could potentially serve as cause

5    to overcome the default of Claims 6, 7, and 8.  Therefore, the Court determines whether

6    counsel was ineffective for failing to raise these claims on appeal.

7                    Non-Statutory Aggravation

8            Petitioner asserts that the trial court relied on kidnapping of the victim as an improper

9    non-statutory aggravating factor.  (Dkt. 38 at 107-08.)  He notes that Arizona law provides

10   that only proven statutory aggravating factors may support a death sentence and that the use

11   of a non-statutory factor violates his rights under the Fifth, Eighth, and Fourteenth

12   Amendments.  (*Id.*)  He also questions the sufficiency of the evidence regarding the

13   kidnapping and asserts that appellate counsel was ineffective for not raising these issues on

14   appeal.  (*Id.* at 107-08, 98.)

15           To support his assertion that the sentencing court improperly considered his

16   kidnapping conviction as a separate, non-statutory aggravator in imposing the death sentence,

17   Petitioner cites the following language in the court's special verdict:  "In this case I do find

18   that there are aggravating circumstances, I find that the offense was committed in an

19   especially cruel manner and I find that there was what I call earlier the classical or common

20   law kidnaping."  (RT 12/21/94 at 31.)

21           The PCR court rejected the allegation that the sentencing judge had improperly "found

22   kidnapping as an aggravating factor."  (Dkt. 63, Ex. D at 16.)  This Court agrees.  Despite

23   any awkwardness or lack of clarity in the sentencing court's language, a fair reading of the

24   reference to Petitioner's kidnapping conviction in the special verdict shows that it was made

25   in the context of the court's assessment of the "cruelty" statutory aggravator.  (*Id.* at 31-32.)

26   The court's reference to Reid's abduction was part of its evaluation of the evidence in

27   support of the State's assertion that her murder satisfied the cruelty prong of the (F)(6) factor.

28
                                                   - 41 -

1   Petitioner's assertion that the court considered and weighed an inappropriate non-statutory

2   aggravating factor beyond the "cruelty" aggravator of A.R.S. § 13-703(F)(6) is without merit.

3   Therefore, appellate counsel was not ineffective for failing to raise this claim on appeal.

4          Even if not considered as a separate aggravator, Petitioner argues there was

5   insufficient evidence to support the sentencing judge's finding, with respect to the (F)(6)

6   cruelty factor, that he kidnapped Reid.  To this end, he notes that the blood found in his trunk

7   "could not be identified as being any particular person's blood" and that the only evidence

8   beyond the blood was testimony from "drinking buddies" that Reid rarely accepted rides

9   home and never from strangers.  (Dkt. 38 at 107-08.)  The Court disagrees.

10         As explained in Claim 5, there was sufficient evidence to establish cruelty beyond a

11  reasonable doubt regardless of whether Reid was kidnapped.  In particular, Petitioner's own

12  admission that he beat Reid, which was corroborated by evidence at the murder scene of a

13  violent confrontation, as well as the fact that she suffered multiple injuries and defecated

14  during the assault, supports a finding under Arizona law that the victim experienced severe

15  mental and physical anguish prior to the infliction of the fatal blows to her head.  The Court

16  concludes that the Arizona Supreme Court would have upheld the cruelty finding on appeal

17  regardless of whether appellate counsel had argued there was insufficient evidence of

18  kidnapping.

19            Substance Abuse as Mitigation

20         At the presentencing hearing, Dr. Flynn testified about Petitioner's emotional and

21  cognitive traits.  He indicated that Petitioner began drinking at a young age, perhaps as early

22  as age twelve.  (RT 11/28/94 at 12.)  From interviews with family and friends, Dr. Flynn

23  believed the drinking "intensified" in recent years and that Petitioner suffered from

24  "physiological" alcoholism, a condition in which a person has a "pre-disposition to develop

25  a need for alcohol."  (*Id.* at 13.)  An alcoholic of this type can experience "blackouts" and

26  "energized" behavior which rapidly fades.  (*Id.* at 14-17.)  Dr. Flynn noted that alcohol abuse

27  is "very strongly correlated with violent behavior" and noted some indication of such conduct

28

1  by Petitioner, including "verbally" intimidating a prostitute to have sex with him without

2  charge and punching his fist through a window at a fast food restaurant.  (*Id.* at 24.)

3         On cross-examination, Dr. Flynn stated that Petitioner did not have a personality

4  disorder, that he suffered from no cognitive defect which prevented him from knowing right

5  from wrong or from conforming his behavior to the law, that he had no emotional disorder,

6  and that he had not suffered any dramatic family abuse.  (RT 11/28/94 at 44-45.)

7         In its special verdict, the court stated:

8              On the intoxication, the defendant's history of intoxication is long,
        longstanding.  There was substance abuse for certainly close to ten years of his
9       life at the time that he committed this offense.  He was age 22 at the time that
        this offense was committed.

10
             But again *I don't believe that the intoxication or substance abuse*
11      *impaired his ability and capacity to appreciate the wrongfulness of his conduct*
        *to any significant degree*.  And in that I take into consideration that when he
12      was stopped approximately 30 minutes from the time the crime was committed
        by the police and photographs were taken at the corner of Broadway and
13      Church here in Tucson, Arizona, and the officers were repeatedly asked
        whether there was any evidence of intoxication, and they repeatedly said
14      nothing of any significance.

15           I am trying to remember whether they – yes, there might have been the
        smell of some alcohol but his conduct was such that it would not indicate that
16      he was intoxicated.  So I don't think that intoxication at all is any sort of a
        mitigating factor.

17
   (RT 12/21/94 at 34 (emphasis added).)   On appeal, the Arizona Supreme Court
18
   acknowledged Petitioner's long-time substance abuse problems, but declined to conclude that
19
   he was impaired by alcohol consumption to such an extent that it interfered with his capacity
20
   to appreciate the wrongfulness of his conduct or to conform his conduct to the law's
21
   requirements.  *Spreitz*, 190 Ariz. at 149-50, 945 P.2d at 1280-81.
22
          Petitioner argues that the sentencing judge erred in not finding that he was intoxicated
23
   when he murdered the victim and that the court confused the two distinct issues of whether
24
   Petitioner was intoxicated at the time of the offense and whether his longstanding alcoholism
25
   and substance abuse could constitute a mitigating factor.  (Dkt. 38 at 109.)  He faults
26
   appellate counsel for not raising these issues on appeal.  (*Id.* at 98.)  The PCR court, in
27

28
                                        - 43 -

denying relief on the "failure to consider" allegation, noted that a sentencing court "can and should consider an individual's long-term alcoholism and substance abuse" as non-statutory mitigation.  It further stated, however, that such evidence is "inconsequential" if it fails to explain the person's behavior at the time of the offense.  (Dkt. 63, Ex. D at 17.)  The PCR court concluded that "there is no evidence in Petitioner's case to suggest that he suffered any long-term effects from his alcohol or drug abuse that precluded him from controlling his behavior."  (*Id.*)

In a capital case, the sentencing court may not refuse to consider, as a matter of law, any relevant mitigating evidence.  *See Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see also Tennard v. Dretke*, 542 U.S. 274, 283 (2004) (reiterating that a sentencer may not be prevented from considering and giving effect to relevant mitigating information).  Nor may the sentencing court confine its consideration of mitigating evidence only to specific factors listed in a statute.  *Hitchcock v. Dugger*, 481 U.S. 393, 398-99 (1987).  Constitutionally relevant mitigating evidence consists of "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  *Lockett*, 438 U.S. at 604. Provided the sentencing court has not refused to consider relevant evidence, it is not required to find proffered evidence mitigating, nor must the court accord such evidence the weight which a defendant believes is appropriate.  *Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994); *Eddings*, 455 U.S. at 114-15.

Under Arizona's capital sentencing statute, the sentencing court shall consider as mitigating circumstances

> any factors that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense, *including but not limited to the following*:
>
>     1.  The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, but not so impaired as to constitute a defense to prosecution.

- 44 -

1   A.R.S. § 13-703(G) (emphasis added).  Furthermore, although mitigating evidence must be

2   considered regardless of whether there is a "nexus" between the mitigating factor and the

3   crime, the Arizona Supreme Court has held that the lack of a causal connection may be

4   considered in assessing the weight of the evidence.  *State v. Newell*, 212 Ariz. 389, 405, 132

5   P.3d 833, 849 (2006); *State v. Hampton*, 213 Ariz. 167, 185, 140 P.3d 950, 968 (2006)

6   (finding horrendous childhood less weighty and not sufficiently substantial to call for

7   leniency, in part, because not tied to the offense).  When the evidence establishes that a

8   defendant "knew right from wrong and could not establish a causal nexus between the

9   mitigating factors and [the] crime," limited value may be accorded to evidence of abusive

10   childhood, personality disorders, and substance abuse.  *State v. Johnson*, 212 Ariz. 425, 440,

11   133 P.3d 735, 750 (2006).

12       After considering Petitioner's arguments in Claim 7, this Court concludes that

13   Petitioner cannot establish appellate ineffectiveness based on counsel's failure to raise these

14   concerns to the state supreme court.  The trial judge's rejection of Petitioner's claim of

15   intoxication was reasonable in light of the evidence presented at trial, especially the

16   testimony of police officers who encountered Petitioner shortly after he committed the crime

17   and Petitioner's detailed recollection of the murder, which was corroborated by evidence at

18   the crime scene.  In addition, the Arizona Supreme Court independently reviewed the record

19   to determine the existence of mitigating factors and found "no basis on which to alter the

20   sentencing judge's decision." *Spreitz*, 190 Ariz. at 149, 945 P.2d at 1280.  This review

21   included consideration of Petitioner's allegations of impairment at the time of the crime.

22   Thus, Petitioner cannot establish prejudice from appellate counsel's failure to specifically

23   argue to the Arizona Supreme Court that the evidence established he was intoxicated when

24   he murdered the victim.

25       With regard to long-term substance abuse as a mitigating factor, it is well established

26   that, so long as mitigating evidence is considered, a state is free to determine the weight it

27   will assign to such evidence. *Harris v. Alabama*, 513 U.S. 504, 512 (1995) (stating that the

28

1    Constitution does not require that a specific weight be given to any particular mitigating

2    factor). Arizona has chosen to assign little value to a history of alcohol abuse if it is not

3    shown that this background contributed to a defendant's conduct at the time of the crime.

4    *Newell*, 212 Ariz. at 405, 132 P.3d at 849; *Johnson*, 212 Ariz. at 440, 133 P.3d at 750. In

5    its special verdict, the sentencing judge specifically noted that Petitioner's history of

6    substance abuse was "longstanding" and had existed for close to ten years prior to the murder.

7    (RT 12/21/94 at 34.) Although the court ultimately concluded that Petitioner's history of

8    substance abuse was not weighty because it lacked a causal connection to the offense, it is

9    clear the court *considered* this evidence. *See Parker v. Dugger*, 498 U.S. 308, 315 (1991)

10   ("We must assume the trial judge considered all this [mitigation] evidence before passing

11   sentence. For one thing, he said he did."); *see also Lopez v. Schriro*, 491 F.3d 1029, 1037

12   (9th Cir. 2007), *cert. denied*, 128 S. Ct. 1227 (2008) (rejecting a claim that the sentencing

13   court failed to consider proffered mitigation where the court did not prevent the defendant

14   from presenting any evidence in mitigation, did not affirmatively indicate there was any

15   evidence it would not consider, and expressly stated it had considered all mitigation evidence

16   proffered by the defendant). Because the trial court's consideration of Petitioner's history

17   of substance abuse comported with both Arizona and federal law, appellate counsel's failure

18   to raise this issue on appeal does not constitute ineffectiveness.

19          Failure to Fully Consider A.R.S. § 13-703(G)(1)

20          Under A.R.S. § 13-703(G)(1), a mitigating circumstance exists if a "defendant's

21   capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the

22   requirements of the law was significantly impaired, but not so impaired as to constitute a

23   defense to prosecution." Petitioner contends that in assessing whether his "subnormal" and

24   "disruptive" childhood satisfied the (G)(1) factor, both the sentencing court and the Arizona

25   Supreme Court considered only the first prong – whether his dysfunctional upbringing

26   impacted his ability to appreciate the wrongfulness of his conduct. He argues that the courts

27   failed to consider the second prong – whether his troubled childhood impacted his ability to

28
                                                - 46 -

conform his conduct to the requirements of the law.  (Dkt. 38 at 111-12.)  He complains that appellate counsel was ineffective for not raising this claim on appeal.  (*Id.* at 98.)

     With regard to Petitioner's upbringing, the sentencing court stated in its special verdict:

> In mitigation:  many factors have been submitted in mitigation.  One is an extremely disruptive childhood.  I think that Dr. Flynn's report worded it well.  Let's see if I can find that report now.  In part Dr. Flynn in his report on page eight said, quote, Christopher Spreitz did not suffer acute dramatic abuse in his family home.  He did suffer pervasive substantial emotional battering and neglect along with inattention to his developmental needs.  None of the available information suggests the home environment was an amenably healthy one for the developing children.  End quote.
>
> And I think that the point that I want to make is that the home was a subnormal home.  And obviously Mr. Spreitz suffered a disruptive childhood with a punitive cold mother, poor social judgment, drinking from the age of ten on, a mother that he could not please no matter what he did; the defendant, his life turned to substance abuse, alcohol and there is some suggestion that he was using cocaine or other drugs.
>
> However, I don't find that that history is a mitigating factor *that impaired his ability to make a judgment as to whether he was acting rightly or wrongly* in the death of the victim in this case.

(RT 12/21/94 at 33-34 (emphasis added).)

     On appeal, the Arizona Supreme Court affirmed the trial court's findings and conclusions:

> We agree with the sentencing judge that defendant's upbringing was subnormal.  The record supports the judge's conclusion that defendant's home life was sadly lacking and that his mother's erratic behavior toward defendant inhibited his emotional and developmental skills.  We also find significant the conclusions of the psychologist testifying on defendant's behalf at the sentencing hearing, who stated that defendant "did not suffer acute, dramatic abuse."  Although we recognize defendant's upbringing as a mitigating circumstance, we accord it little weight.  While defendant's inadequate upbringing may have contributed to his emotional immaturity and undeveloped humanitarian skills, we concur with defendant's statement at his sentencing hearing that "people that have had as bad a background or worse haven't killed.  And I don't want what everyone has said about my background to be an excuse for what's happened."
>
> . . . .
>
> The sentencing judge found that defendant's ability to appreciate the wrongfulness of his conduct was not impaired on the night of the murder to any significant extent by substance abuse, emotional disorders, situational

stress, or by a combination of these.  Our review of the record convinces us that the trial court's finding was proper.  In fact, Dr. Flynn, the forensic psychologist who testified for defendant at the sentencing hearing, advised the court that defendant did not suffer from an emotional disorder or any cognitive disorder affecting his ability to distinguish right from wrong *or to conform his behavior to the law*.

*Spreitz*, 190 Ariz. at 149-50, 945 P.2d at 1280-81 (emphasis added).

It is evident that the Arizona courts considered both prongs of the (G)(1) diminished capacity factor in assessing Petitioner's proffered mitigating evidence.  The fact that they did not expressly repeat, word for word, the language of (G)(1) does not suggest that they failed to consider and give effect to the proffered evidence.  *See Moormann v. Schriro*, 426 F.3d 1044, 1055 (9th Cir. 2005) ( "the trial court need not exhaustively analyze each mitigating factor 'as long as a reviewing federal court can discern from the record that the state court did indeed consider all mitigating evidence offered by the defendant'") (quoting *Clark v. Ricketts*, 958 F.2d 851, 858 (9th Cir. 1991)); *see also Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (en banc) (when it is evident that all mitigation evidence was considered, the federal constitution does not require that the trial court "exhaustively document its analysis of each mitigating factor").  Moreover, there is nothing in the record to suggest that Petitioner's difficult upbringing impacted his ability to conform his conduct to the law.  On the contrary, as noted by the Arizona Supreme Court, Petitioner's own expert testified that Petitioner did not suffer from any emotional or cognitive disorders that would satisfy the (G)(1) factor.  *Spreitz*, 190 Ariz. at 150, 945 P.2d at 1281.  Therefore, appellate counsel was not ineffective for failing to raise this issue on appeal or in a motion for reconsideration to the state supreme court.

Conclusion

Petitioner has failed to establish constitutional ineffectiveness from appellate counsel's failure to raise Claims 6, 7, and 8 on appeal.  Therefore, Petitioner has failed to establish cause and prejudice to overcome the procedural default of these claims and is not entitled to habeas relief on the IAC allegations set forth in Claim 4.3-B.

- 48 -

1

2

**Claim 9: Petitioner's Sentence of Death Violates the Eighth Amendment's Prohibition Against Cruel and Unusual Punishment**

3       Petitioner raises a series of challenges to the death penalty and Arizona's death

4  sentencing scheme. The claims were presented on direct appeal and rejected by the Arizona

5  Supreme Court. *Spreitz*, 190 Ariz. at 151, 945 P.2d at 1282. For the reasons discussed below,

6  they are without merit.

7              The Death Penalty is Cruel Under Any Circumstance

8       Petitioner, citing no authority save Justice Brennan's dissent in *Walton*, 497 U.S. at

9  674-77, argues that the death penalty is cruel under any circumstance and therefore violates

10  the Eighth Amendment. (Dkt. 38 at 113.) The Arizona Supreme Court denied this claim in

11  summary fashion, citing *Gulbrandson*, 184 Ariz. at 72-73, 906 P.2d at 605-06, which in turn

12  cited *Gregg v. Georgia*, 428 U.S. 153, 186-87 (1976). *Spreitz*, 190 Ariz. at 151, 945 P.2d

13  at 1282. This ruling was neither contrary to nor an unreasonable application of controlling

14  Supreme Court law. *See Gregg*, 428 U.S. at 187 ("[T]he infliction of death as a punishment

15  for murder is not without justification and thus is not unconstitutionally severe.").

16              Arizona's Method of Inflicting Death is Cruel and Unusual

17       Petitioner contends that Arizona's method of execution violates the federal

18  constitution because it forces him to choose between death by lethal gas and death by lethal

19  injection and because either form of execution inflicts unnecessary pain. (Dkt. 38 at 113-14.)

20  The Arizona Supreme Court rejected this claim, citing *State v. Spears*, 184 Ariz. 277, 291,

21  908 P.2d 1062, 1076 (1996). *Spreitz*, 190 Ariz. at 151, 945 P.2d at 1282.

22       As noted by Respondents, Arizona law does not require a defendant to pick his

23  method of execution. If no selection is made, death by lethal injection is the prescribed

24  method. *See* A.R.S. § 13-757(B). Thus, Petitioner is not "required" to make a choice or be

25  an active participant in his own death. Petitioner cites no Supreme Court precedent to

26  support his assertion that execution by lethal injection is inherently cruel and unusual

27  punishment in violation of the Eighth Amendment. In *LaGrand v. Stewart*, 133 F.3d 1253,

28

- 49 -

1   1265 (9th Cir. 1998), the Ninth Circuit rejected a claim that execution by lethal injection is

2   per se unconstitutional.  More recently, in *Baze v. Rees*, ___ U.S. ___, 128 S. Ct. 1520

3   (2008), the Supreme Court upheld the constitutionality of Kentucky's method of lethal

4   injection.  The decision of the Arizona Supreme Court rejecting this claim was neither

5   contrary to nor an unreasonable application of clearly established federal law.

6           Mandatory Imposition of Death Penalty

7           Petitioner argues that Arizona's sentencing scheme is unconstitutional because it

8   mandates that a death sentence be imposed whenever an aggravating circumstance and no

9   mitigating circumstances are found.  (Dkt. 38 at 114.)  The Arizona Supreme Court denied

10  this claim in summary fashion, citing *State v. Bolton*, 182 Ariz. 290, 310, 896 P.2d 830, 850

11  (1995), which in turn cited *Walton*, 497 U.S. at 651-52.  *Spreitz*, 190 Ariz. at 151, 945 P.2d

12  at 1282.

13          In *Walton*, four justices held that the Arizona death penalty statute does not "[create]

14  an unconstitutional presumption that death is the proper sentence."  *Id.* (citing *Blystone v.*

15  *Pennsylvania*, 494 U.S. 299 (1990) (Pennsylvania statute requiring imposition of the death

16  penalty if aggravating circumstances are found to exist and no mitigating circumstances are

17  found to exist held constitutional), and *Boyde v. California*, 494 U.S. 370 (1990)).   Four

18  dissenters disagreed.  *Walton*, 497 U.S. at 687-88 (Blackmun, J., dissenting).  However, in

19  a concurring opinion, Justice Scalia agreed, for different reasons, that the mandatory nature

20  of the Arizona death penalty statute did not violate the Eighth Amendment:

21          The mandatory imposition of death – without sentencing discretion – for a
            crime which States have traditionally punished with death cannot possibly
22          violate the Eighth Amendment, because it will not be "cruel" (neither
            absolutely nor for the particular crime) and it will not be "unusual" (neither in
23          the sense of being a type of penalty that is not traditional nor in the sense of
            being rarely or "freakishly" imposed).
24
25  *Id.* at 671 (Scalia, J., concurring).  Therefore, the determination of the Arizona Supreme

26  Court rejecting this claim was not contrary to nor an unreasonable application of controlling

27  Supreme Court law.

28

1          Death Qualifying the Sentencing Judge

2          The federal constitution requires only that a defendant receive a fair trial before a fair

3    and impartial judge with no bias or interest in the outcome. *Bracy v. Gramley*, 520 U.S. 899,

4    904-05 (1997).  Petitioner makes no allegation of bias or interest on behalf of the judge who

5    presided at his trial and sentencing.  Nor does he cite authority, let alone Supreme Court

6    precedent, to support his assertion that the federal constitution affords him the right to voir

7    dire a sentencing judge to determine his or her view on the death penalty.  The decision of

8    the Arizona Supreme Court denying this claim was neither contrary to nor an unreasonable

9    application of controlling Supreme Court law.

10         Lack of Guidance for Sentencing

11         Petitioner complains that Arizona's capital sentencing scheme fails to sufficiently

12   channel the sentencing court's discretion and to provide objective standards for weighing

13   aggravation and mitigation.  (Dkt. 38 at 115-16.)  The Arizona Supreme Court rejected these

14   claims, citing *State v. Spears*, 184 Ariz. at 291, 908 P.2d at 1076, and *State v. Roscoe*, 184

15   Ariz. 484, 501, 910 P.2d 635, 652 (1996).  *Spreitz*, 190 Ariz. at 151, 945 P.2d at 1282.

16         In order for a capital sentencing scheme to pass constitutional muster, it must

17   "genuinely narrow the class of persons eligible for the death penalty and must reasonably

18   justify the imposition of a more severe sentence on the defendant compared to others found

19   guilty of" the capital crime. *Zant v. Stephens*, 462 U.S. 862, 877 (1983).  A death penalty

20   scheme must provide an "objective, evenhanded and substantively rational way" for

21   determining whether a defendant is eligible for the death penalty.  *Id.* at 879.  Defining

22   specific "aggravating circumstances" is the accepted "means of genuinely narrowing the

23   class of death-eligible persons and thereby channeling the [sentencing authority's]

24   discretion." *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988).  Such a circumstance must

25   meet two requirements.  First, "the [aggravating] circumstance may not apply to every

26   defendant convicted of a murder; it must apply only to a subclass of defendants convicted

27   of murder." *Tuilaepa*, 512 U.S. at 972; *see Arave v. Creech*, 507 U.S. 463, 474 (1993).

28
                                        - 51 -

1   Second, "the aggravating circumstance may not be unconstitutionally vague." *Tuilaepa*, 512

2   U.S. at 972; *see Arave*, 507 U.S. at 473; *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980).

3          In addition to the requirements for determining eligibility for the death penalty, the

4   Supreme Court has imposed a separate requirement for the selection decision, "where the

5   sentencer determines whether a defendant eligible for the death penalty should in fact receive

6   that sentence." *Tuilaepa*, 512 U.S. at 972.  "What is important at the selection stage is an

7   individualized determination on the basis of the character of the individual and the

8   circumstances of the crime." *Zant*, 462 U.S. at 879.  Accordingly, a statute which "provides

9   for categorical narrowing at the definition stage, and for individualized determination and

10  appellate review at the selection stage" will ordinarily meet constitutional concerns, 462 U.S.

11  at 879, so long as a state ensures "that the process is neutral and principled so as to guard

12  against bias or caprice." *Tuilaepa*, 512 U.S. at 973.

13         Arizona's death penalty statute allows only certain, specific aggravating

14  circumstances to be considered in determining eligibility for the death penalty.  A.R.S. § 13-

15  703(F).  "The presence of aggravating circumstances serves the purpose of limiting the class

16  of death-eligible defendants, and the Eighth Amendment does not require that these

17  aggravating circumstances be further refined or weighed by [the sentencing authority]."

18  *Blystone v. Pennsylvania*, 494 U.S. at 306-07.  In addition, Arizona's capital sentencing

19  statute requires the sentencing court to consider as mitigating circumstances "any factors

20  proffered by the defendant or the state that are relevant in determining whether to impose a

21  sentence less than death, including any aspect of the defendant's character, propensities or

22  record and any of the circumstances of the offense."  A.R.S. § 13-703(G).  Because it

23  provides for "categorical narrowing" at the definition stage and for an "individualized

24  determination" at the selection stage, Arizona's death penalty scheme is not unconstitutional.

25  The determination of the Arizona Supreme Court rejecting these claims was neither contrary

26  to nor an unreasonable application of controlling Supreme Court law.

27

28
                                        - 52 -

1              Mitigation Burden of Proof

2          As noted by Petitioner himself (Dkt. 38 at 115), the Supreme Court has specifically

3    rejected this claim.  *Walton*, 497 U.S. at 649-51; *see also Delo v. Lashley*, 507 U.S. 272, 275-

4    76 (1993) (*Walton* establishes "that a State may require the defendant 'to bear the risk of

5    nonpersuasion as to the existence of mitigating circumstances.'").  The Arizona Supreme

6    Court's denial of this claim was neither contrary to nor an unreasonable application of

7    controlling Supreme Court authority.

8              Lack of Specific Mitigation Findings & Cumulative Consideration

9          Petitioner cites no authority to support his claim that the sentencing court violates the

10   federal constitution if it fails to make specific findings as to each proffered mitigator.  On the

11   contrary, the Ninth Circuit has held that "the trial court need not exhaustively analyze each

12   mitigating factor 'as long as a reviewing federal court can discern from the record that the

13   state court did indeed consider all mitigating evidence offered by the defendant.'"

14   *Moormann*, 426 F.3d at 1055 (quoting *Clark*, 958 F.2d at 858).  On the issue of considering

15   Petitioner's proffered mitigation cumulatively, aside from any constitutional question, the

16   Arizona Supreme Court specifically stated that it considered Petitioner's mitigating

17   circumstances cumulatively in its independent review of the sentence.  *Spreitz*, 190 Ariz. at

18   152, 945 P.2d at 1283.  Thus, assuming the sentencing court erred in failing to consider the

19   mitigation cumulatively, and that this error violated Petitioner's constitutional rights, the

20   error was cured by the Arizona Supreme Court's independent review.  *See Clemons v.*

21   *Mississippi*, 494 U.S. 738, 750, 754 (1990) (holding that appellate courts are able to fully

22   consider mitigating evidence and are constitutionally permitted to affirm a death sentence

23   based on independent re-weighing despite any error at sentencing).

24              Lack of Burden on State to Prove Death is Appropriate

25          As previously discussed, Arizona's death penalty scheme allows certain, statutorily-

26   defined aggravating circumstances to be considered in determining eligibility for the death

27   penalty.  For death to be an appropriate sentence, at least one aggravating factor must be

28
                                        - 53 -

1   found and the court must determine that mitigating factors do not warrant a lesser sentence.

2   *See* A.R.S. § 13-703(E).  This scheme has been found constitutionally sufficient.  *See Jeffers*,

3   497 U.S. at 774-77; *Walton*, 497 U.S. at 649-56; *Woratzeck*, 97 F.3d at 334-35; *Smith*, 140

4   F.3d at 1272.   The determination of the Arizona Supreme Court rejecting this claim was

5   neither contrary to nor an unreasonable application of controlling Supreme Court law.

6              Mitigation Evidence Not Fully Considered

7          Petitioner asserts that his constitutional rights were violated because Arizona law

8   requires him to prove mitigating circumstances by a preponderance of the evidence and

9   further requires that mitigation be "sufficiently substantial" to warrant leniency.  (Dkt. 38 at

10  119.)  Again, the United States Supreme Court has upheld the constitutionality of Arizona's

11  death penalty sentencing scheme, including its requirement that Petitioner bear the burden

12  of proving mitigating circumstances sufficiently substantial to call for leniency.  *See Walton*,

13  497 U.S. at 650.  The decision of the Arizona Supreme Court denying relief on this claim

14  was neither contrary to nor an unreasonable application of controlling Supreme Court law.

15             Lack of Prosecutorial Standards

16         A statutory scheme for imposing a death sentence may not be unguided and arbitrary.

17  *See Gregg*, 428 U.S. at 206; *Zant*, 462 U.S. at 877, 879.   As long as the system has

18  safeguards to ensure this, it passes constitutional muster.  Arizona's statutory scheme meets

19  this test.  Petitioner cites no authority to support his contention that a statutory scheme is

20  unconstitutional simply because it does not have specified curbs on the discretion of a

21  prosecutor in deciding whether to seek a death sentence, particularly in light of the

22  requirements placed upon the sentencing court in determining whether to impose a death

23  sentence.   The decision of the Arizona Supreme Court denying this claim was neither

24  contrary to nor an unreasonable application of controlling Supreme Court law.

25             Discriminatory Application

26         Clearly established federal law holds that "a defendant who alleges an equal

27  protection violation has the burden of proving "the existence of purposeful discrimination"

28                                  - 54 -

1   and must demonstrate that the purposeful discrimination "had a discriminatory effect" on

2   him. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) (quoting *Whitus v. Georgia*, 385 U.S.

3   545, 550 (1967)). Therefore, to prevail on this claim Petitioner "must prove that the decision

4   makers in his case acted with discriminatory purpose." *Id.*  Petitioner does not attempt to

5   meet this burden.  He offers no evidence specific to his case that would support an inference

6   that his sex or economic status played a part in his sentence.  *See Richmond v. Lewis*, 948

7   F.2d 1473, 1490-91 (9th Cir. 1990), *vacated on other grounds*, 986 F.2d 1583 (9th Cir. 1993)

8   (holding that statistical evidence that Arizona's death penalty is discriminatorily imposed

9   based on race, sex, and socio-economic background is insufficient to prove discriminatory

10  purpose).  The Arizona Supreme Court's rejection of this claim was neither contrary to nor

11  an unreasonable application of controlling Supreme Court law.

12              Improper Consideration of Presentence Report

13              The trial court indicated that it read the PSR prior to sentencing.  (RT 12/21/94 at 2.)

14  The PSR recounted that the victim's sister, Susan Eddleman, told the report's author that the

15  victim "never made it to forty years old, and my wish is that Mr. Spreitz does not either."

16  (PSR at 5.)  Eddleman also spoke at the sentencing hearing.  In addition to recounting the

17  effect her sister's murder had on her, she characterized Petitioner as a "monster" who

18  "tortured" her sister before murdering her.  She requested that he be sentenced to death.  (RT

19  12/21/94 at 14, 16.)

20              Petitioner contends that the sentencing court's exposure to Eddleman's statements in

21  the PSR and at sentencing created an "unacceptable risk" that the court was swayed to

22  impose an arbitrary sentence in violation of Petitioner's constitutional rights.  (Dkt. 38 at

23  121.)  The Arizona Supreme Court summarily denied this claim, citing *State v. Spears*, 184

24  Ariz. at 292, 908 P.2d at 1077.[14]

25  _____

26          [14]    In *Spears*, the Arizona Supreme Court held that while testimony from family

27  members of the victim regarding the appropriate sentence may violate the United States
    Constitution if presented to a capital sentencing jury, no violation occurs if presented to a

28                                          - 55 -

1    In *Booth v. Maryland*, 482 U.S. 496, 509 (1987), the Supreme Court held that the

2    introduction of a victim impact statement during the sentencing phase of a capital case

3    violated the Eighth Amendment.  In *Payne v. Tennessee*, 501 U.S. 808, 827, 830 n.2 (1991),

4    the Supreme Court revisited *Booth* and overruled it in part, holding that the Eighth

5    Amendment does not erect a per se barrier to admission of victim impact evidence, but left

6    intact *Booth*'s prohibition on the admissibility of opinions from the victim's family about the

7    crime, the defendant, or the appropriate sentence.

8    Under Arizona law at the time of Petitioner's trial, the judge, rather than the jury,

9    determined the penalty in a capital case.  A.R.S. § 13-703.  As the Arizona Supreme Court

10   has explained, judges are presumed to know and apply the law.  *Gulbrandson*, 184 Ariz. at

11   66, 906 P.2d at 599; *see Jeffers*, 38 F.3d at 415.  Therefore, "in the absence of evidence to

12   the contrary, [the Court] must assume that the trial judge properly applied the law and

13   considered only the evidence he knew to be admissible."  *Gretzler v. Stewart*, 112 F.3d 992,

14   1009 (9th Cir. 1997).

15   In its special verdict, the court recounted the evidence presented at trial involving the

16   circumstances of the murder and concluded that the aggravating factor of cruelty under § 13-

17   703(F)(6) had been satisfied.   (RT 12/21/94 at 32-33.)   The court then discussed the

18   mitigating circumstances in detail, including Petitioner's subnormal childhood, his history

19   of substance abuse and his intoxication the night of the crime, his "emotional growth" during

20   incarceration, his age and immaturity, his lack of a criminal history or propensity for

21   violence, and his potential for rehabilitation.  (*Id*. at 33-36.)  The court concluded that the

22   mitigating factors did not "balance" the aggravation and sentenced Petitioner to death.  (*Id*.

23   at 36.)

24   Petitioner presents no evidence indicating the sentencing court was swayed by

25   _____

26   sentencing judge because "we have generally assumed that the sentencing judge is capable
27   of focusing on the relevant factors and setting aside the irrelevant, inflammatory, and
     emotional factors absent evidence to the contrary."  184 Ariz. at 292, 908 P.2d at 1077.

28

1   anything other than the appropriate criteria required in passing a death sentence.  In fact, as

2   just summarized, a review of the special verdict supports the conclusion that the state court's

3   sentence of death was based solely on its findings that a statutory aggravating factor had been

4   established based on the evidence presented at trial and that the mitigation evidence offered

5   by Petitioner did not warrant a lesser sentence.  (*See* RT 12/21/94 at 32-36.)  Nothing in the

6   court's rationale indicated that it was influenced by Eddleman's statements.  In the absence

7   of any clear indication that the court improperly considered those statements, this Court

8   assumes that the trial judge followed the Arizona guidelines in passing sentence.  *See*

9   *Gretzler*, 112 F.3d at 1009.

10   Moreover, the Arizona Supreme Court on appeal reweighed the aggravating and

11   mitigating evidence and independently determined that the death sentence was appropriate.

12   *Spreitz*, 190 Ariz. at 152, 945 P.2d at 1283.  In doing so, the court likewise predicated its

13   determination solely on its conclusion that the aggravating factor of cruelty had been

14   established and that the mitigation presented was "not sufficiently substantial" to warrant

15   leniency.  *Id.*

16   Because there is no evidence the state courts misapplied the law and improperly

17   considered the statements of the victim's sister when imposing the death sentence, Petitioner

18   cannot establish a constitutional violation.  The Arizona Supreme Court's denial of this claim

19   was neither contrary to nor an unreasonable application of clearly established federal law.

20   **Claim 4.2-F:**       **Sentencing Counsel was Ineffective With Regard to the**
                            **Presentence Report**

21

22   Petitioner contends that counsel's representation fell below objectively reasonable

23   standards when, in relation to the PSR, he failed to (1) object to the probation officer's

24   account of his interview with the victim's sister, Susan Eddleman; (2) assist Petitioner in

25   preparation for his interview with the probation officer; and (3) assist Petitioner in drafting

26   an allocution letter to the sentencing judge.  (Dkt. 38 at 92-95.)  The PCR court specifically

27   addressed only the second allegation, stating that Petitioner "cites no authority for this

28

- 57 -

1    argument and the court finds that such a claim is without any merit whatsoever." (Dkt. 63,

2    Ex. D at 12.)

3        *Background*

4        During her interview, Eddleman told the PSR author that she was devastated

5    psychologically, emotionally, and physically by her sister's death. (PSR at 4.) Her sister's

6    murder affected her so much that her marriage ended and she was unable to hold a job. (*Id.*)

7    She described terrible nightmares "which I've had to express to my therapist to make sure

8    I am sane." (*Id.*) She characterized her relationship with her sister, at least while growing

9    up, as "extremely close," noting "our mother ran off and left us with our father, who at the

10   age of twelve (me) my father died of cancer.  We had five of the worst stepmothers

11   Cinderella could only imagine." (*Id.* at 4-5) She stated that her sister never made it to age

12   forty and she hoped Petitioner would not either. (*Id.* at 5.)

13       In the "Defendant's Statement" portion of the PSR, the probation officer recounted

14   Petitioner's disbelief that he had killed Reid; Petitioner stated, "I was a private duty nurse,

15   I increase life not take a life." (*Id.* at 4.) The PSR further quoted Petitioner as stating "a lady

16   died, that really sucks.  It was senseless that she died." (*Id.*)

17       In a letter to the sentencing judge, Petitioner recounted his life history, including his

18   troubled childhood and family life, his substance abuse, and his hopes for the future.

19   Petitioner also expressed remorse for killing Ruby Reid:

20           Knowing I was the cause of Ms. Reid's death is something I will have to live
             with. Believe me it's not an easy thing that I can just forget about. It does not
21           matter that I am locked up. Even if I was free I would still think about her and
             know if it wasn't for me, she would be alive today.
22
     (Dkt. 63, Ex. T at 2.)  Petitioner closed his letter by stating:
23
             Your Honor, I have tried to give you some idea of what I was and who
24           I worked hard to become.  Maybe you are thinking, this is all fine and dandy,
             but what about Ms. Reid?  Like I said before, her death was senseless and I
25           should accept responsibility and be held accountable.  All I can do is work
             hard toward a positive goal.  If I don't do that Ms. Reid's death will never
26           make sense.

27   (*Id.* at 3.) Petitioner then wrote "P.S. I am truly sorry I have caused Ms. Reid's death, Your

28

1    Honor." (*Id.*)  At his sentencing allocution, Petitioner apologized for causing the victim's

2    death.  (RT 12/21/94 at 12.)

3        *Analysis*

4        Petitioner argues that the information recounted in Eddleman's "victim impact

5    statement" was prejudicial and unfounded.  (Dkt. 38 at 93.)  He asserts that if counsel had

6    investigated Eddleman he would have discovered there was virtually no contact between her

7    and Reid, and that Reid changed her name to avoid contact with her family.  He also

8    contends Eddleman cared little about the Reid's alcoholism and poverty.  (*Id.*)

9        Petitioner cannot establish either deficient performance or prejudice as a result of

10    counsel's failure to object to Eddleman's statements in the PSR.  The report merely recounts

11    Eddleman's anguish at her sister's death.  Although Petitioner contends that Eddleman's

12    suggestion that she and Reid were "extremely close" is misleading, this assertion is

13    unsubstantiated.  While Eddleman told the PSR author they were extremely close (PSR at

14    4), at trial she testified that she had not actually seen Reid in ten years, but stated they talked

15    on the phone "all the time."  (RT 8/10/94 at 318.)  These statements are not incompatible.

16    During her trial testimony, Eddleman also explained Reid's name change, stating that her

17    sister changed her name in order to forget a troubled adolescence.  Their mother abandoned

18    them when they were children and their father died, leaving them to be raised by a

19    stepmother who treated them terribly.  (*Id.* at 319.)  It was Reid's traumatic relationship with

20    her stepmother, not adverse feelings toward Eddleman, that led her to adopt a new name.

21    (*Id.*)

22        Petitioner cites no evidence to support his assertion that Eddleman and Reid were not

23    close, particularly while growing up, or that Eddleman did not care about Reid's personal

24    struggles.  Counsel could reasonably have concluded that there was no basis for objecting

25    to these statements and that such an objection would not have succeeded.  *See United States*

26    *v. Popoola*, 881 F.2d 811, 813 (9th Cir. 1989) (defendant's "conclusory allegations of

27    inaccuracies in the [presentence] report are unsupported and do not suggest the report as a

28

1   whole is misleading"), *overruled on other grounds by Lozada v. Deeds*, 964 F.2d 956 (9th

2   Cir. 1992).

3         More importantly, as previously noted, nothing in the record indicates that

4   Eddleman's statement improperly swayed the court to impose the death penalty.  The court

5   weighed the aggravating factor of cruelty against the mitigation presented by Petitioner and

6   concluded that a death sentence was appropriate.  (RT 12/21/94 at 31-36.)  In making such

7   an assessment, the court was not prohibited from considering a family member's impact

8   evidence as long as it did not also consider that person's opinions about the crime, the

9   defendant, or the appropriate sentence.  *See Payne*, 501 U.S. at 827, 830 n.2.  Nothing in the

10  record indicates the sentencing court considered any inappropriate statements by Eddleman

11  in determining sentence.  (*See* RT 12/21/94 at 31-36.)

12        Finally, even if counsel had objected to Eddleman's statements and they had been

13  deleted from the PSR, there is no reasonable probability this would have resulted in the court

14  giving Petitioner a lesser sentence.  Much of the evidence in the PSR was recounted

15  elsewhere in the record.  For instance, as just noted, in her testimony at trial and sentencing,

16  as well as in the letter she wrote to the court, Eddleman expressed many of the same

17  sentiments Petitioner found objectionable in the PSR.  (*See* RT 8/10/94 at 318-19; RT

18  12/21/94 at 14-16; PSR, Attached Letter from Susan Eddleman.)

19        Petitioner also claims that counsel was ineffective in failing to prepare him for the

20  presentence interview with the probation officer and in failing to assist him with the letter

21  he wrote to the judge prior to sentencing.  As a result of counsel's deficiencies, Petitioner

22  contends, the statements he made to the PSR author and in the letter to the judge were

23  inadequate to express his true remorse.  (Dkt. 38 at 94-95.)

24        Petitioner provides no affidavits from counsel or anyone else to support his assertion

25  that counsel offered him no assistance or that he even sought counsel's help with respect to

26  these matters.   Such unsupported, conclusory assertions are insufficient to establish

27  ineffective assistance of counsel.  In addition, even if counsel did nothing to assist him in

28

1    these endeavors, Petitioner cannot establish prejudice.

2    Though perhaps inarticulate and inelegant, Petitioner's statements, considered in

3    context, do not portray him as lacking remorse or unable to appreciate the wrongfulness of

4    his conduct.  To the contrary, Petitioner's full statement, as recounted in the PSR, indicates

5    remorse for the killing.  At the sentencing hearing, he repeated that he was sorry for causing

6    the victim's death and apologized to her family.  (RT 12/21/94 at 12.)  He also reiterated

7    remorse in his letter to the judge.  (Dkt. 38, Ex. T at 2, 3.)  Thus, the record is replete with

8    examples of Petitioner indicating his regret and remorse for killing Reid.  For that reason,

9    even assuming counsel did nothing to aid Petitioner in preparing for his presentence

10   interview or in writing his letter to the judge, his claims that counsel could have helped him

11   do better are purely speculative.

12   Finally, there is no reasonable probability that had Petitioner been more eloquent in

13   his expressions of remorse, he would have received a lesser sentence.   Although the

14   sentencing court did not directly comment on Petitioner's remorse as a mitigating factor, the

15   Arizona Supreme Court specifically considered the issue and found it less than compelling

16   in light of Petitioner's failure to report the crime when presented with the opportunity to do

17   so. *Spreitz*, 190 Ariz. at 150-51, 945 P.2d at 1281-82.

18   For all of these reasons, the determination of the state court denying these claims was

19   neither contrary to nor an unreasonable application of *Strickland*.  Claim 4.2-F is denied.

20   <u>**CONCLUSION**</u>

21   The Court finds that Petitioner has failed to establish entitlement to habeas relief on

22   any of his claims.  Therefore, Petitioner's Amended Petition for Writ of Habeas Corpus will

23   be denied and judgment entered accordingly.

24   <u>**CERTIFICATE OF APPEALABILITY**</u>

25   In the event Petitioner appeals from this Court's judgment, and in the interests of

26   conserving scarce resources that otherwise might be consumed drafting an application for a

27   certificate of appealability to this Court, the Court on its own initiative has evaluated the

28

1   claims within the Amended Petition for suitability for the issuance of a certificate of

2   appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir.

3   2002).

4          Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal

5   is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a

6   certificate of appealability ("COA") or state the reasons why such a certificate should not

7   issue.  Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has

8   made a substantial showing of the denial of a constitutional right."  With respect to claims

9   rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the

10  district court's assessment of the constitutional claims debatable or wrong."  *Slack v.*

11  *McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4

12  (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1)

13  whether the petition states a valid claim of the denial of a constitutional right and (2) whether

14  the court's procedural ruling was correct.  *Id.*

15         The Court finds that reasonable jurists could debate its resolution of Claims 1, 4.1-A,

16  4.2-B, 4.2-C, 4.2-D, and 4.2-E.  The Court therefore grants a certificate of appealability as

17  to these claims.  For the reasons stated in this Order and in the Court's May 2005 Order

18  addressing Petitioner's Renewed Motion for Evidentiary Hearing filed (Dkt. 89), the Court

19  declines to issue a certificate of appealability for Petitioner's remaining claims and

20  procedural issues.

21         Accordingly,

22         **IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus

23  (Dkt. 38) is denied.  The Clerk of Court shall enter judgment accordingly.

24         **IT IS FURTHER ORDERED** that the stay of execution entered by the Court on

25  April 29, 2002 (Dkt. 3) is **VACATED.**

26         **IT IS FURTHER ORDERED** that a Certificate of Appealability is **GRANTED** as

27  to the following issues:

28
                                        - 62 -

1        Whether Claim 1, alleging a violation of Petitioner's right to a speedy
2   trial, fails on the merits.

3        Whether Claim 4.1-A, alleging ineffective assistance of counsel for
    failing to raise a timely speedy trial right claim, fails on the merits.

4        Whether Claim 4.2-B, alleging ineffective assistance of counsel for
5   failing to present at sentencing evidence to humanize Petitioner, fails on the
    merits.

6        Whether Claim 4.2-C, alleging ineffective assistance of counsel for
7   failing to present at sentencing evidence of Petitioner's history of head
    injuries, fails on the merits.

8        Whether Claim 4.2-D, alleging ineffective assistance of counsel for
9   failing to present at sentencing evidence of Petitioner's childhood abuse, fails
    on the merits.

10       Whether Claim 4.2-E, alleging ineffective assistance of counsel for
11  failing to present at sentencing evidence of Petitioner's intoxication, fails on
    the merits.

12       **IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order

13  to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix,

14  AZ 85007-3329.

15

16       DATED this 11th day of May, 2009.

17

18

19

20  _____
                John M. Roll
21          Chief United States District Judge

22

23

24

25

26

27

28